TO BE PUBLISHED IN THE OFFICIAL REPORTS

Opinion No. 92-201----October 6, 1992

Requested by:          CHARLES QUACKENBUSH, Member of the
                       California State Assembly

Opinion by:            DANIEL E. LUNGREN, Attorney General
                       Mark L. Krotoski, Special Assistant
                       Attorney General

THE HONORABLE CHARLES W. QUACKENBUSH, MEMBER OF THE CALIFORNIA ASSEMBLY, has requested an opinion on the following questions:

1.  Under federal law, does the use of metal detectors in schools to deter and detect the presence of weapons brought by students to school violate the "reasonableness" requirement of the Fourth Amendment?  Is "individualized suspicion" a required element under the Fourth Amendment for student searches, such as metal detector searches?

2.  Does any California statute provide for or permit the use of metal detectors on school grounds?  Does the use of metal detectors in school violate California law, including the constitutional right of privacy, under article I, section 1?  Of what bearing on these questions arising under California law is the inalienable right to safe schools, under article I, section 28(c) of the Constitution?

CONCLUSIONS

1.  Under at least two separate legal theories, schools may use metal detectors to deter the presence of weapons consistent with requirements under the Fourth  Amendment. First, school metal detector searches may be justified under the standard of "reasonableness, under all the circumstances," as dictated by *New Jersey v. T.L.O.* (1985) 469 U.S. 325, and related cases, which take into account the special circumstances of student searches conducted by school officials.  Alternatively, school metal detector searches may be warranted under the administrative search doctrine, which has provided the constitutional basis for metal detector searches in airports and at courthouses.  Under either standard, appropriate procedures may be employed which advance the substantial government issues at stake and minimize the degree of intrusion into privacy interests.  The application of the settled standards under either legal theory also leads to the conclusion that individualized suspicion is not a prerequisite for school metal detector searches of students.

2.  Schools may decide to implement metal detector searches to deter weapons as part of a school safety plan adopted pursuant to Education Code section 35294 et seq., or consistent with Education Code section 49330 et seq., which permits the removal of "injurious objects."  Because no statute proscribes the use of metal detectors in schools, school districts have the authority to employ metal detectors under Education Code section 35160 et seq.  While California law forbids any school employees from conducting body cavity or strip searches of students, see Education Code section 49050, subjecting students to a metal detector examination does not transgress this statutory prohibition.

Because several compelling interests independently outweigh the minimal intrusion of privacy, the right of privacy under the California Constitution does not prohibit the reasonable use of metal detectors to deter weapons in schools.  While the right to safe schools is an important inalienable right secured under the California Constitution, full consideration of this provision is not required unless it is found to be in an unavoidable conflict with the right to privacy. In that unexpected event, under settled principles of constitutional construction, the safe

1

schools clause would permit the reasonable application of metal detectors in schools.

OUTLINE OF ANALYSIS

**I.    OVERVIEW**

**II.    FOURTH AMENDMENT ANALYSIS**

    A.    OVERVIEW:  WHETHER "SEARCH" IS UNREASONABLE?

    B.    SPECIAL FOURTH AMENDMENT PRINCIPLES APPLIED IN SCHOOL SETTING

        1.    Less Stringent Fourth Amendment Standard

        2.    Standard of "Reasonableness Under all the Circumstances"

    C.    INDIVIDUALIZED SUSPICION FOR STUDENT SEARCHES IN GENERAL

    D.    SCHOOL METAL DETECTOR SEARCHES AND INDIVIDUALIZED SUSPICION

        1.    Privacy Interests in the School Setting

        2.    State/School Interests

            a.    Education and Training

            b.    Maintaining Discipline and Order

            c.    Interest in Safety/Duty to Protect

            d.    Weapons Deterrence

        3.    Adequate Safeguards to Minimize the Intrusion

            a.    Screening Device

            b.    Prior Notice

            c.    Minimizing the Intrusion At Each Juncture

            d.    Indiscriminate Application of Established Procedures

            e.    Random Application of Established Procedures

                (1)    Schools

                (2)    Individuals

4. Balancing Test Application

5. Other Potential Contentions and Issues

    a. The Relevancy of the Incidence of Detection

    b. Demonstrated Need

    c. The Role of Less Restrictive Alternatives

6. Conclusion

E. ADMINISTRATIVE SEARCH DOCTRINE

    1. Discussion

    2. The Role of "Qualified Consent" Under the Administrative Search Doctrine

F. CONCLUSION

III. **STATE LAW ANALYSIS**

A. DEVELOPMENT OF SAFE SCHOOL PLANS UNDER EDUCATION CODE SECTION 35294 ET SEQ.

B. REMOVAL OF INJURIOUS OBJECTS UNDER EDUCATION CODE SECTION 49330 ET SEQ.

C. STATUTORY PROHIBITION AGAINST BODY CAVITY AND STRIP SEARCHES UNDER EDUCATION CODE SECTION 49050 ET SEQ.

D. SCHOOL DISTRICT AUTHORITY UNDER EDUCATION CODE SECTION 35160 ET SEQ.

E. RIGHT OF PRIVACY

    1. Balancing Test

        a. Compelling Interest Test

        b. Reasonableness Test

        c. Consideration of the Inalienable Right to Safe Schools

F. UNREASONABLE SEARCHES UNDER THE CALIFORNIA CONSTITUTION

IV. **CONCLUSION**

## I. OVERVIEW

At least three states have enacted legislation permitting school metal detector searches.[1] More than fifty school systems across the country have used metal detectors to deter the possession or use of weapons by students at school .[2] Some schools in California have also used

---

1.  Tennessee law expressly provides:

> To facilitate a search which is found to be necessary, metal detectors and other devices designed to indicate the presence of dangerous weapons . . . may be used in searches, including hand-held models which are passed over or around a student's body, and students may be required to pass through a stationary detector.

Tenn. Code Ann. § 49-6-4207.

A Louisiana statute, governing student searches and searches of persons entering public school buildings or grounds, explicitly permits "a random search with a metal detector."  La. Rev. Stat. Ann. §§ 17:416.3(A)(2), 17:416.6(A).

One Florida statute, which governs student searches, expressly provides that its terms do not "prohibit the use of metal detectors" for student searches under the statute.  Fla. Stat. § 232.256(4).

No reported decisions have been discovered discussing the applicability of these statutes in the metal detector context.

2.  According to one recent report, the following twenty-one school systems have used metal detectors:

| | |
|---|---|
| Birmingham, Alabama | Boston Public Schools |
| Chester High School, | Chicago Public Schools |
| South Philadelphia | Dallas Independent School District |
| Detroit Public Schools | Fairfax County, Virginia |
| District of Columbia Public Schools | Houston Independent School District |
| Jackson, Mississippi | Montgomery, Alabama |
| Jacksonville Public Schools, Florida | New Orleans Parish School Board, |
| New York Public Schools, New York | Louisiana |
| Pittsburgh Public Schools | Norfolk Public Schools, Virginia |
| Richmond, Virginia | Selma High School, Alabama |
| Shreveport, Louisiana | Winston/Salem, North Carolina |
| St. Louis Public Schools, Missouri | |

*Weapons in Schools*, National School Safety Center Resource Paper (Nov. 26, 1991).

Another recent survey indicates 44 districts in which hand-held metal detectors are used:

| | |
|---|---|
| Alief Independent School District | Alief, Texas |
| Alvin Independent School District | Alvin, Texas |
| Baton Rouge Public Schools | Baton Rouge, Louisiana |
| Benton Harbor Area Schools | Benton Harbor, Michigan |
| Boston Public Schools | Roslindale, Massachusetts |
| Bridgeport Public Schools | Bridgeport, Connecticut |
| Broward County School Board | Ft. Lauderdale, Florida |
| Charleston County School District | North Charleston, S. Carolina |

4

| | |
|---|---|
| Chicago Board of Education | Chicago, Illinois |
| Clark County School District | Las Vegas, Nevada |
| Compton Unified School District | Compton, California |
| Detroit Public Schools | Detroit, Michigan |
| Duval County Public Schools | Jacksonville, Florida |
| Fairfax County Public Schools | Burke, Virginia |
| Ferguson-Florissant School District | Ferguson, Missouri |
| Galveston Independent School District | Galveston, Texas |
| Hattiesburg Public Schools | Hattiesburg, Mississippi |
| Hillsbororugh County Schools | Tampa, Florida |
| Indianapolis Public Schools | Indianapolis, Indiana |
| Inglewood Unified School District | Inglewood, California |
| Jackson (MS) Public Schools | Jackson, Mississippi |
| Jefferson County (AL) School District | Birmingham, Alabama |
| Kansas City School District | Kansas City, Missouri |
| Kansas City-Wyandotte Unified School District | Kansas City, Kansas |
| Lansing School District | Lansing, Michigan |
| Little Rock School District | Little Rock, Arkansas |
| Lynwood Unified School District | Lynwood, California |
| Mobile County Board of School Commissioners | Mobile, Alabama |
| Moss Point School District | Moss Point, Mississippi |
| New Orleans Public Schools | New Orleans, Louisiana |
| New York City Public Schools | New York, New York |
| Norfolk Public Schools | Norfolk, Virginia |
| North Forest Independent School District | Houston, Texas |
| Oak Unified School District | Oakland, California |
| Palm Beach County School Board | Palm Beach Gardens, Florida |
| Prince William County School Board | Manassas, Virginia |
| Roanoke Public Schools | S.W. Roanoke, Virginia |
| Rochester City Schools | Rochester, New York |
| San Antonio Independent School District | San Antonio, Texas |
| San Bernardino City Schools | San Bernardino, California |
| Spring Independent School District | Houston, Texas |
| Volusia County School Board | DeLand, Florida |
| Wake County Public Schools | Raleigh, North Carolina |
| Washington, D.C. Public Schools | Washington, D.C. |

According to this survey, ten districts also use fixed station metal detectors:

| | |
|---|---|
| Baton Rouge Public Schools | Baton Rouge, Louisiana |
| Benton Harbor Area Schools | Benton Harbor, Michigan |
| Boston Public Schools | Roslindale, Massachusetts |
| Chicago Board of Education | Chicago, Illinois |
| Detroit Public Schools | Detroit, Michigan |
| Galveston Independent School District | Galveston, Texas |
| New York City Public Schools | New York, New York |
| North Forest Independent School District | Houston, Texas |
| Pittsburgh Public Schools | Pittsburgh, Pennsylvania |
| Roanoke Public Schools | S.W. Roanoke, Virginia |

R. J. Rubel (compiler), *National Directory of School Security and School Police Operations* (National Alliance for Safe Schools) (1992 ed.); see also *Regional News*, USA Today, at 11A

metal detectors at selected school events, while others are giving serious consideration to this issue.[3/]

Notwithstanding this current application of metal detectors, no published decision has been discovered which directly and comprehensively considers the legal validity of using metal detectors in schools under both federal and California law.[4/]  Consequently, this opinion will

---

(Sept. 16, 1992) (noting Milwaukee School Board Committee has approved a proposal for random weapons searches of students with hand-held metal detectors); *To Counter Violence, Schools Tighten Security*, Boston Globe, at 1 (Aug. 16, 1992) (noting weapons have declined since Brockton schools began using hand-held metal detectors on a random basis); *Clayton Principals to Use Metal Detectors*, Atlanta Journal and Constitution, at B3 (Aug. 13, 1992) (reporting the Clayton County School District will be the first one in the Atlanta metropolitan area to issue hand-held metal detectors to high school principals to check "students suspected of carrying weapons on campus"); *Regional News*, USA Today, at 8A (Mar. 11, 1992) ("Knox County school officials [in Tennessee] are being issued hand-held metal detectors in effort to stop pupils from bringing weapons to class."); *How to Keep Kids Safe*, Newsweek, at 26 (Mar. 9, 1992) ("Nearly a quarter of all major urban high schools now use metal detectors."); *Regional News*, USA Today, at 5A (Jan. 7, 1992) (noting "[r]andom use of metal detectors will begin within month to reduce number of weapons brought to city schools" in Youngstown, Ohio); *Recruiting Defense Doesn't Hold Up*, Chicago Tribune, at 24 (Dec. 8, 1991) (noting use of metal detectors at high school basketball game in Milwaukee and that metal detectors will be used in January at every boy's game); *Student Searches Yield Fear*, USA Today, at 1A (Nov. 12, 1991) (noting the commencement of random metal detector searches in public schools in Indianapolis, Indiana and general support for the program).

Other schools are considering the use of metal detectors.  See, e.g., *Teen-ager Shoots 6 in School After Fight*, Los Angeles Times, at A12 (Sept. 12, 1992) (after shooting incident at an Amarillo, Texas high school, student calls for metal detectors and school administrator acknowledges hand-held metal detectors had been previously ordered); *Milwaukee School Chief Seeks Metal Detectors to Find Guns*, Chicago Tribune, at 3 (Apr. 6, 1992) (reporting school officials "confiscated more than 40 firearms in public schools since autumn" and the Milwaukee School Superintendent is recommending the use of metal detectors); *P.G. Schools Looking into Metal Detectors*, Washington Post, at D4 (Mar. 17, 1992) ("School officials in Prince George's County [in Maryland] said yesterday they are weighing the possibility of equipping high school security officers with hand-held metal detectors in the wake of Friday's shooting at Potomac High School."); *School for Violent Youths, More Security Proposed in Montgomery*, Washington Post, at D3 (Jan. 22, 1992) (school superintendent proposing school security measures, including metal detectors, for Montgomery County schools in Maryland); *Norfolk May Scan Students; Board Approves Metal Detectors*, Washington Post, at C1 (Nov. 23, 1991) ("Norfolk's public schools could become the first in the state to randomly search students with metal detectors in an effort to deter them from carrying guns.").

3. See, e.g., *East Bay High School Fans to be Searched*, San Francisco Chronicle, at A19 (Feb. 15, 1992) ("Spectators at [Oakland] high school basketball games are being searched with hand-held metal detectors under a new policy designed to thwart gang confrontations."); *Dorsey's Championship Season*, Los Angeles Times, at B6, col.3 (Dec. 17, 1991) (noting in Los Angeles City championship high school football game "[a]ll fans were searched with metal detectors"); *Plan for Metal Detectors in Oakland Schools*, San Francisco Chronicle, at A26 (Nov. 8, 1991) (Oakland school superintendent calls for metal detectors in some schools.)

4. Only one unpublished federal court and one published state court decision have been found expressly considering the constitutionality of using metal detectors in schools.  In both cases, the trial courts upheld the reasonable application of metal detectors in schools.  See

fully evaluate the constitutional and statutory issues associated with whether the use of metal detectors to deter the presence of weapons in schools may satisfy the "reasonableness" requirement of the Fourth Amendment, and other standards mandated under the California Constitution and statutes.

## II.    FOURTH AMENDMENT ANALYSIS

### A.    OVERVIEW:  WHETHER "SEARCH" IS UNREASONABLE?

In other related contexts, the use of scanning devices such as metal detectors (or magnetometers) has been deemed a "search" within the meaning of the Fourth Amendment.[5] The Fourth Amendment protection against unreasonable searches and seizures extend to searches and seizures of students by public school officials.  *New Jersey v. T.L.O.* (1985) 469 U.S. 325, 333; *In re William G.* (1985) 40 Cal.3d 550, 557, 561.  The central question, therefore, is whether metal detector searches of students by school officials constitute an "unreasonable" search under the Fourth Amendment.  See, e.g., *Skinner v. Railway Labor Executives' Ass'n* (1989) 489 U.S. 602, 619 ("[T]he Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable."); *Elkins v. United States* (1960) 364 U.S. 206, 222 (same).[6]

---

*Bradley v. Milliken* (E.D. Mich. Apr. 10, 1986) No. 70-35257 (holding that proposed amendment and rules and regulations to Detroit public schools code of student conduct concerning student metal detector searches "pass facial constitutional muster" and that whether there is "a sufficient basis for a particular search must be determined on a case-by-case basis"); *People v. Dukes* (N.Y. City Crim. Court Jan. 31, 1992) No. 91N050052, 580 N.Y.S.2d 850, 151 Misc.2d 295 (upholding hand-held metal detector searches at a New York City high school under 1989 Board of Education guidelines).  No published or unpublished appellate court decision has been discovered.

5.  See, e.g., *United States v. Edwards* (2d Cir. 1974) 498 F.2d 496, 499 & n.8 (use of magnetometer at airport); *United States v. Albarado* (2d Cir. 1974) 495 F.2d 799, 803 (same); *United States v. Epperson* (4th Cir.) 454 F.2d 769, 770 (same), cert. denied (1972) 406 U.S. 947; *People v. Hyde* (1974) 12 Cal.3d 158, 164 (same); see also *United States v. Henry* (9th Cir. 1980) 615 F.2d 1223, 1227 (concerning x-ray scan of briefcase at airport security checkpoint; noting x-ray scan is also more intrusive than a magnetometer).

Reference in this opinion to metal detectors is synonymous with magnetometers.  These devices, which have now become common at airports and at entrances to many public buildings and elsewhere, are intended to detect the presence of weapons by activating when an established amount of metal is passed or carried through the zone of detection.  See *United States v. Lopez* (E.D.N.Y. 1971) 328 F. Supp. 1077, 1083, 1085-86, 1100-01 (discussing operations of magnetometer).

6.  The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment has been made applicable to the unreasonable searches and seizures by state officials through the due process clause of the Fourteenth Amendment.  See, e.g., *T.L.O.*, 469 U.S. at 334 (and cases cited therein).

B.      SPECIAL FOURTH AMENDMENT PRINCIPLES APPLIED IN SCHOOL
         SETTING

As a starting point, the United States Supreme Court has repeatedly noted that what is reasonable under the Fourth Amendment "depends on all the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez* (1985) 473 U.S. 531, 537 (quoted in *Skinner*, 489 U.S. at 619); see also *T.L.O.*, 469 U.S. at 337 (noting "what is reasonable," under the Fourth Amendment, "depends on the context within which a search takes place") (emphasis added).  Recent decisions of the United States Supreme Court and California Supreme Court have highlighted special Fourth Amendment considerations to be applied in evaluating student searches by school officials arising in the school setting.

1.      Less Stringent Fourth Amendment Standard

After carefully weighing the student's legitimate expectations of privacy and the school's interest in maintaining an educational environment, the United States Supreme Court concluded "the school setting requires some easing of the [Fourth Amendment] restrictions to which searches by public authorities are ordinarily subject." *T.L.O.*, 469 U.S. at 340.  In light of concerns unique to the school environment, two significant modifications were made to the Fourth Amendment analysis which is traditionally employed in the criminal law context.

First, the court held that school officials do not need to satisfy the warrant requirement of the Fourth Amendment before conducting a student search.  Second, the court concluded that the level of suspicion to justify the search need not rise to the level of probable cause *T.L.O.*, 469 U.S. at 340-41.  The California Supreme Court has adopted each of these holdings for student searches.  See *William G*, 40 Cal.3d at 564.

As the United States and California Supreme Courts have noted, in most instances it would be impractical for school officials to satisfy the warrant and probable cause requirements prior to conducting a student search.  *T.L.O.*, 469 U.S. at 340; *William G*, 40 Cal.3d at 564-65. Often maintaining order requires close supervision and a swift and flexible response.  *T.L.O.*, 469 U.S. at 340 (noting "swift and informal disciplinary procedures" are often required); id. at 352-53 (Blackmun, J., concurring); *William G*, 40 Cal.3d at 564-65.  Certainly, the substantial school interest in maintaining order would be frustrated by compliance with the warrant requirement. *T.L.O.*, 469 U.S. at 340.  While the warrant and probable cause standards are mandated for law enforcement, students and teachers, in contrast, hold a special relationship, often founded on day-to-day familiarity and contact with one another.  Id. at 349 (Powell, J., concurring).  In taking these sui generis factors into account, the United States Supreme Court concluded that the application of the Fourth Amendment standard in the school setting should "spare teachers and school administrators the necessity of schooling themselves in the niceties of probable cause and permit them to regulate their conduct according to the dictates of reason and common sense." Id. at 343.

2.      Standard of "Reasonableness Under all the Circumstances"

With regard to the second aspect involving "the level of suspicion of illicit activity needed to justify a search," the United States Supreme Court held that the propriety of a search of a student by school officials, under the Fourth Amendment, depends on the "reasonableness,

under all the circumstances, of the search." *T.L.O.*, 469 U.S. at 340 & 341.[7] According to the Court, this Fourth Amendment analysis of "reasonableness" in the school context is based upon two separate inquiries.

The <u>first</u> is whether the search was "justified at its inception;" that is, whether "there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." <u>Id</u>. at 341-42 (citing *Terry v. Ohio* (1968) 392 U.S. 1, 20). The <u>second</u> determination is whether the search "was reasonably related in scope to the circumstances which justified the interference in the first place;" that is, whether "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." <u>Id</u>.; <u>see also</u> *William G*, 40 Cal.3d at 564 (adopting two-step inquiry).[8]

In other Fourth Amendment circumstances, this two-part test has been applied by the United States Supreme Court to evaluate the reasonableness of a search where suspicion has generally focused on the conduct of an individual or group of individuals.[9] Since the conducting of metal detector searches on an entire student body constitutes a suspicionless search, this opinion next confronts the question of whether "individualized suspicion" is a prerequisite for searches of students by school officials.

---

7. The United States Supreme Court made clear that it only determined the standard governing "searches carried out by school authorities acting alone and on their own authority." *T.L.O.*, 469 U.S. at 341 n.7. The Court did not address "the question of the appropriate standard for assessing the legality of searches conducted by school officials in conjunction with or at the behest of law enforcement authorities." <u>Id</u>.

The California Supreme Court also left open the question of "what standard should apply where law enforcement officials are involved at the outset of a student search, or where a school official acts in cooperation with, or as an agent of, law enforcement." *William G*, 40 Cal.3d at 562 n.12.

8. While the majority of the *T.L.O.* Court did not say so at the time, this framework of analysis for student searches, dictated under *T.L.O.* and its progeny, is an aspect of the Fourth Amendment doctrine where "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin v. Wisconsin* (1987) 483 U.S. 868, 873 (quoting *T.L.O.*, 469 U.S. at 351 (Blackmun, J., concurring)). As the United States Supreme Court has subsequently acknowledged, "A State's . . . operation of a school . . . presents `special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Griffin*, 483 U.S. at 873-74; <u>see also</u> *Skinner*, 489 U.S. at 620 (listing the operation of a school as a "special needs" context under the Fourth Amendment); *O'Connor v. Ortega* (1987) 480 U.S. 709, 720 (noting unsuitability of warrant requirement to school environment). Having determined under *T.L.O.* and other cases that a search of students by school officials satisfies the "special needs" exception, the United States Supreme Court has instructed that the standard of "reasonableness under all the circumstances" should apply in the school setting, as it has in other "special needs" contexts. <u>Compare, e.g.</u>, *O'Connor*, 480 U.S. at 725-26 (adopting same reasonableness standard, including two-part test, for public employer intrusions on government employees "for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct").

9. <u>See</u> *O'Connor*, 480 U.S. at 725-26 (public employer intrusions of government employees for investigations of work-related misconduct or for noninvestigatory, work-related objectives); *Montoya de Hernandez*, 473 U.S. at 541 (detention of traveler at border based on reasonable suspicion that contraband is being smuggled); *Terry*, 392 U.S. at 20 (permitting police officer "stop and frisk" based only upon reasonable suspicion).

## C.    INDIVIDUALIZED SUSPICION FOR STUDENT SEARCHES IN GENERAL

Because the facts of its decision in *T.L.O.* involved individualized suspicion, the United States Supreme Court expressly left open the question "whether individualized suspicion is an essential element of the reasonableness standard" which the Court adopted "for searches by school authorities." *T.L.O.*, 469 U.S. at 342 n.8.  This issue arguably has been settled, however, under current California case law for student searches in general.

The Court of Appeal had the opportunity to consider directly whether individualized suspicion is required for student searches.  In *In re Alexander B* (2d. Dist. 1990) 220 Cal.App.3d 1572, the only published California case directly confronting this question, the dean of students at Grant High School in Van Nuys attempted to prevent a clash between two groups of students during a summer session.  One member of one group said, "Don't pick on us; one of those guys has a gun," as the student pointed toward a third group consisting of five or six students remaining near the confrontation.  Id. at 1576.  At the request of the dean, two members of the Los Angeles Unified School District Police Department conducted a search of the students for weapons, ultimately discovering a machete knife and scabbard.  The court rejected the student's argument that the school lacked individual suspicion to search him.  Id. at 1577-78.  In upholding the search, the court noted "suspicion was focused on a group of five or six students. Given the potential danger to students and staff which would have resulted from inaction, a weapons search of the several accused students was reasonable."  Id. at 1578 (emphasis added). Significantly, the appellate court held that the search "was not only reasonable, it was constitutionally compelled."  Id. at 1577.  This portion of the ruling was also based upon the constitutional right to safe schools under the California Constitution, article I, section 28(c). Id.[10]

---

10. In contrast, *William G* was decided before the students' "inalienable right" to attend safe schools became effective.  The search in *William G* occurred on October 1, 1979, prior to the passage of Proposition 8, which included the right to safe schools in article I, § 28(c), on June 8, 1982.  See *William G*, 40 Cal.3d at 558 n.5.

While the *William G* decision was based upon "both state and federal law," id., the California Supreme Court has not had occasion to consider whether a requirement of individualized suspicion is a prerequisite for school metal detector searches or, alternatively, whether it may be required in light of the mandatory, inalienable right to safe schools under California Constitution article I, § 28(c), or other statutory provisions.  See Discussion in Section III(E)(1)(c), infra.

In *William G*, the California Supreme Court adopted a standard which "is consistent with" the United States Supreme Court's decision in *T.L.O.*  See *William G*, 40 Cal.3d at 564. Both the United States and California Supreme Courts referred to their standards as requiring "reasonable suspicion."  See, e.g. *T.L.O.*, 469 U.S. at 346; *William G*, 40 Cal.3d at 566.  As already noted, the United States Supreme Court expressly left open the question of whether individualized suspicion is required for student searches.  In articulating the standard of reasonableness, the California Supreme Court specified that the standard requires a showing of "articulable facts, together with rational inferences from those facts, warranting an objectively reasonable suspicion that the student or students to be searched are violating or have violated a rule, regulation or statute."  *William G*, 40 Cal.3d at 564.  As a corollary, the Court noted that a search "predicated on mere curiosity, rumor, or hunch" is "unlawful."  Id.

While the majority in *William G* never used the terms "individualized suspicion," the concurrence and dissent of Chief Justice Bird did.  See *William G*, 40 Cal.3d at 569 (Bird, J., concurring and dissenting).  This language in the concurrence and dissent, of course, is not dispositive.  Most importantly, the question of whether individualized suspicion is a prerequisite

While the holding of *Alexander B* therefore suggests, as a general matter, that individualized suspicion may not be required for student searches on school grounds, that broader issue has not been presented by the questions raised in this opinion. Wholly apart from the question of whether individualized suspicion is required for student searches in general, no federal or state court published decision has addressed this issue in the separate and specific context of school metal detector searches. This narrower, open question of whether individualized suspicion should be required for school metal detector searches is considered next.

### D. SCHOOL METAL DETECTOR SEARCHES AND INDIVIDUALIZED SUSPICION

A review of pertinent Fourth Amendment case law leads to the conclusion that individualized suspicion is not required for metal detector searches on school grounds.

In certain limited circumstances, the United States Supreme Court has held that the Fourth Amendment does not mandate a requirement of individualized suspicion for searches or seizures to be reasonable.[11/] Although "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure," *Martinez-Fuerte*, 428 U.S. at 560, "a showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable." *Skinner*, 489 U.S. at 624. Thus, the United States Supreme Court recently observed, a search may be reasonable without individualized suspicion "where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion." Id. (emphasis added); see also *T.L.O.*, 469 U.S. at 342 n.8 (noting exception to individualized suspicion requirement "where the privacy interests implicated by a search are minimal and where `other safeguards' are [also] available `to assure that the individual's reasonable expectation of privacy is not subject to the discretion of the official in the field'") (quoting *Delaware v. Prouse* (1979) 440 U.S. 648, 654-55 (emphasis added; citation omitted)).

These competing interests must be considered and balanced in order to determine whether the school's "need to conduct the suspicionless searches required" under a metal detector program "outweighs the privacy interests" of students. *Von Raab*, 489 U.S. at 668. Further, the existence of safeguards to minimize any intrusion of privacy and eliminate any opportunity for the exercise of official arbitrary discretion must be explored and evaluated. The students' legitimate expectations of privacy in the school environment are first considered.

---

to mass student searches by school officials was not before the *William G* court. The California Supreme Court has found that individualized suspicion is not mandated for some searches. See, e.g., *Ingersoll v. Palmer* (1987) 43 Cal.3d 1321, 1327 (upholding sobriety checkpoints). Nonetheless, as a general matter, the reliance of the court in *Alexander B* on *William G* and other Fourth Amendment cases and the safe schools clause under the California Constitution, at least for now, indicates that individualized suspicion may not be a prerequisite for all student searches. The next section addresses the more specific question whether individualized suspicion is a prerequisite for metal detector searches in schools.

11. See, e.g., *Michigan Dep't of State Police v. Sitz* (1990) 496 U.S. 444, 448-51 (highway sobriety checkpoint initial detention of all vehicles for brief examination for signs of intoxication); *National Treasury Employees Union v. Von Raab* (1989) 489 U.S. 656, 668 (United States Customs Service urinalysis test from employees seeking transfer or promotion to certain positions); *Skinner*, 489 U.S. at 624-33 (blood, urine and breath testing of railroad employees in safety-sensitive positions); *United States v. Martinez-Fuerte* (1976) 428 U.S. 543, 560-62 (border vehicle check point referral from primary to secondary inspection station); *Camara v. Municipal Court of San Francisco* (1967) 387 U.S. 523 (upholding "area" warrant to inspect for building code violations).

1.      Privacy Interests in the School Setting

It is well-settled that the Fourth Amendment protects only legitimate expectations of privacy.  See generally *Katz v. United States* (1967) 389 U.S. 347, 350-52.  While "students within the school environment have a lesser expectation of privacy than members of the population generally," *T.L.O.*, 469 U.S. at 348 (Powell, J., concurring); see also *William G*, 40 Cal.3d at 563; *Stern v. New Haven Community Schools* (E.D. Mich. 1981) 529 F. Supp. 31, 36; accord *People v. Kenway* (4th Dist. 1990) 219 Cal.App.3d 441, 445 (noting "reduced expectation of privacy . . . at school") (citations omitted), students do retain legitimate interests in privacy at school.  For example, the United States Supreme Court has noted that "schoolchildren may find it necessary to carry with them a variety of legitimate, noncontraband items, and there is no reason to conclude that they have necessarily waived all rights to privacy in such items merely by bringing them onto school grounds." *T.L.O.*, 469 U.S. at 339.  The California Supreme Court has also stated that "a student always has the highest privacy interests in his or her own person, belongings, and physical enclaves, such as lockers." *William G*, 40 Cal.3d at 563.[12]

In addition to the general lesser expectation of privacy of students in the school environment, as a usual matter, the passing through a metal detector constitutes a minimal invasion of privacy, particularly when contrasted with a frisk or pat-down or more intrusive physical search.  One federal appellate court has described the insubstantial intrusion resulting from a metal detector scan as follows:

> The passing through a magnetometer has none of the indignities involved in . . . a frisk.  The use of the device does not annoy, frighten or humiliate those who pass through it.  Not even the activation of the alarm is cause for concern, because such a large number of persons may activate it in so many ways.  No stigma or suspicion is cast on one merely through the possession of some small metallic object.  Nor is the magnetometer search done surreptitiously, without the knowledge of the person searched.  Signs warn [participants] of it, and the machine is obvious to the eye.

*Albarado*, 495 F.2d at 806 (quoted in *Wilkinson v. Forst* (2d Cir. 1987) 832 F.2d 1330, 1340, cert. denied (1988) 485 U.S. 1034).  Numerous cases have noted the minimal intrusion resulting from metal detector scans.[13]  Finally, relative to other suspicionless searches which have been upheld, metal detector searches constitute an insubstantial intrusion of privacy.[14]

---

12.  In *T.L.O.*, 469 U.S. at 337 n.5, the United States Supreme Court left open the question "whether a schoolchild has a legitimate expectation of privacy in lockers, desks, or other school property provided for the storage of school supplies."  This issue is not implicated by metal detector searches.

13.  See, e.g., *McMorris v. Alioto* (9th Cir. 1978) 567 F.2d 897, 900 ("A magnetometer is a relatively inoffensive method of conducting a search, and it is less restrictive than alternative methods."); *Epperson*, 454 F.2d at 771 (noting minimal intrusion of magnetometer "because the person scrutinized is not even aware of the examination"); *United States v. Slocum* (3d Cir. 1972) 464 F.2d 1180, 1182 (noting limited invasion of privacy by magnetometer); *Hyde*, 12 Cal.3d at 164 (noting magnetometer search at airport is "minimally intrusive"); *People v. Valenzuela* (3d Dist. 1984) 151 Cal.App.3d 180, 186 (concluding "a walk-through metal detector search involves an insignificant invasion of personal rights"); cf. *People v. Owens* (2d Dist. 1982) 134 Cal.App.3d 144, 147 (x-ray examination of checked airport luggage "imposes a minimal invasion of privacy").

14.  Compare *Sitz*, 496 U.S. at 448 (highway sobriety checkpoint where average vehicle delay was "approximately 25 seconds"); *Von Raab*, 489 U.S. at 661-63 (urinalysis drug testing of

2.      State/School Interests

As will be shown, the state and school interests in a metal detector search program, to be considered against this minimal invasion of privacy, are both substantial and compelling.  At a minimum, these government interests include:  (a) the education and training of the state's students; (b) maintaining discipline and order in the classroom and on school premises; (c) an obligation to furnish a safe, secure environment for learning; and (d) deterring the presence of weapons on school grounds.  Each of these interests is considered in turn.

a.      Education and Training

Education has been called "the most important function of state and local governments." *Brown v. Board of Education* (1954) 347 U.S. 483, 493 (quoted in *T.L.O.*, 469 U.S. at 353 (Blackmun, J., concurring)).  Clearly, the state has a "compelling interest" to educate and train its students.  *T.L.O.*, 469 U.S. at 350 (Powell, J., concurring); see also *Schaill*, 864 F.2d at 1324 ("[I]f students are to be educated at all, an environment conducive to learning must be maintained.").  Education represents one of the most important investments that society makes in itself and its future, affecting not only individual development and potential but also the economic and cultural well-being of the state and nation.  See *Plyler v. Doe* (1982) 457 U.S. 202, 221-23 & n.20 (discussing importance of education in our society); *Serrano v. Priest* (1976) 18 Cal.3d 728, 767 (holding education under California equal protection clause is a fundamental right), cert. denied (1977) 432 U.S. 907; *Serrano v. Priest* (1971) 5 Cal.3d 584, 608-10 (noting several grounds for holding education to be a fundamental interest), cert. denied (1977) 432 U.S. 907.

The California Constitution has established the primary role of education in our state.  Article IX, section 1 stipulates that "[a] general diffusion of knowledge and intelligence [is] essential to the preservation of the rights and liberties of the people."  Section 5 of the same Article mandates the Legislature "provide for a system of common schools by which a free school shall be kept up and supported in each district. . . ."  Subject to specified exceptions, the Legislature has required that all children aged six to eighteen must attend school full-time.  Education Code section 48200; see generally *In re James D.* (1987) 43 Cal.3d 903, 909-10, cert. denied (1988) 485 U.S. 959.

In fiscal year 1991, more than one-third of the state General Fund (nearly $16.5 billion or 37.5% of the total) is allocated to public education (K through 12) in California, representing the state's largest single budget item.  *1992-93 Governor's Budget Background Information*, at 5, 9 (Jan. 9, 1992).  The overall numbers of the California public school system demonstrate its breadth.  In October 1990, there were over 7,400 public schools (consisting of 4,867 elementary schools, 853 intermediate schools, 136 junior high schools, 802 high schools, 432 continuation schools, 181 alternative schools, 147 special education schools, and 67 county-run schools). *Fingertip Facts on Education in California, California Department of Education*, at 2 (1991).  Nearly 210,000 full-time public school teachers taught over 4.9 million students (including over 3.5 million elementary school students and more than 1.3 million high school students).  Id.

---

United States Customs Service employees seeking transfer or promotion to specified positions); *Skinner*, 489 U.S. at 608-12 (blood, breath and urine drug testing of railroad employees in safety-sensitive positions for mandatory post-accident testing; after a reportable incident or specific rule violation; or after reasonable suspicion of drug or alcohol impairment); *Martinez-Fuerte*, 428 U.S. at 558-60 (vehicle detention at permanent border checkpoint for visual inspection, brief questioning, and possible production of documents and referral to secondary inspection area); *Schaill v. Tippecanoe County School Corp.* (7th Cir. 1988) 864 F.2d 1309, 1310-11 (random urinalysis drug testing of high school athletes and cheerleaders); *Ingersoll,* 43 Cal.3d at 1327 (sobriety checkpoint average vehicle detention of 28 seconds).

These figures indicate the broad impact of and the considerable public resources committed to education in California. As will be shown, the presence of weapons in schools poses a real threat to the primary mission of school officials and administrators to educate and train our state's students.

b.      Maintaining Discipline and Order

To accomplish this vital mission of establishing and providing healthy learning environments, the United States Supreme Court has recognized that the state has a "substantial interest" in "maintaining discipline in the classroom and on school grounds." *T.L.O.*, 469 U.S. at 339; see also id. at 350 ("Without first establishing discipline and maintaining order, teachers cannot begin to educate their students.") (Powell, J., concurring); accord Penal Code § 627(a)(1) (same); *Katchak v. Glasgow Independent School System* (W.D. Ky. 1988) 690 F. Supp. 580, 582-83 (noting role of discipline in education). To promote the interest in school discipline, California law requires that "at least every four years . . . each public school . . . shall adopt rules and procedures on school discipline applicable to the school." Education Code § 35291.5 (emphasis added). The statute sets forth the procedure for adoption, notice, enforcement, and review of the promulgated discipline rules. Id. The Legislature also requires every public school teacher to "hold pupils to a strict account for their conduct on the way to and from school, on the playgrounds, or during recess." Education Code section 44807. This provision also provides public school officials with statutory authority "to maintain order, protect property, or protect the health and safety of pupils, or to maintain proper and appropriate conditions conducive to learning." Id.; see also *William G*, 40 Cal.3d at 560; id. at 571-72 (Mosk, J., dissenting) (noting implicit in this statutory obligation "is the right of school officials to search pupils and their property on reasonable suspicion of misconduct and a sincere belief that the search is necessary to maintain `conditions conducive to learning'"); accord *Sullivan v. City of Sacramento* (3d Dist. 1987) 190 Cal.App.3d 1070, 1079 (noting statutory duty to supervise pupils under § 44807); *Lehto v. City of Oxnard* (2d Dist. (1985) 171 Cal.App.3d 285, 292 (same). As the California Supreme Court has stated, "Such regulation is necessary precisely because of the commonly known tendency of students to engage in aggressive and impulsive behavior which exposes them and their peers to the risk of serious physical harm." *Dailey v. Los Angeles Unified School Dist.* (1970) 2 Cal.3d 741, 748 (citing, inter alia, Education Code § 13557, the predecessor to § 44807).

In discussing the interest in maintaining discipline, the United States Supreme Court noted the problem of violent crime in schools by citing to a 1978 federal report. *T.L.O.*, 469 U.S. at 339. The problem of crime and violence in schools in general remains at unacceptable levels and the presence and use of weapons in schools in particular has dramatically increased in recent years. Consequently, this issue has been the subject of recent congressional hearings. See "Safe Schools: Drawing the Line on Crime," *Selected Crime Issues: Prevention and Punishment, Hearings before the House Judiciary Subcommittee on Crime and Criminal Justice*, 102d Cong., 1st Sess. 563-706 (July 17, 1991); Gun-Free School Zones Act of 1990, *Hearing before the House Judiciary Subcommittee on Crime*, 101st Cong., 2d Sess. (Sept. 6, 1990). To address the problem of crime and violence in schools and their environs, federal and state statutes have been enacted with the view of fostering drug-free or safe "school zones," usually within 1,000 feet of school grounds.[15]

---

15. See, e.g., *Gun-Free School Zones Act of 1990*, 18 U.S.C. §§ 921(25), (26), 922(q) (prohibiting possession or discharge of a firearm on school grounds and within 1,000 feet of school grounds); see also 21 U.S.C. § 860 (enhanced penalties for the distribution or manufacturing of drugs "in" or "on" or "within 1,000 feet" of school grounds).

Similar safeguards on school grounds or within designated "school zones" are provided under California law. See, e.g., Penal Code § 626.9 (prohibiting the possession or bringing of

In 1979, the Legislature found and declared that "violence on school grounds ha[d] become pandemic in many areas of the state" during the prior decade and that [p]roliferation of weapons and other injurious objects brought onto school grounds by pupils serves to exacerbate instances of violence." Education Code section 49330 note (section 1(a) & (b) of Stats. 1979, c. 210, p. 454); see also Education Code section 32250 (1980 statute including Legislature's recognition that "crime, including vandalism, and violence have reached an alarming level at school sites throughout California"). The most recent report available on crime in California public schools notes that high campus crime rates "continue to disrupt the educational process for students and staff members." *School Crime in California for the 1988-89 School Year, the Fourth Annual Report Prepared for the California State Legislature Pursuant to A.B. 2483, Chapter 1607 (Statutes of 1984) Penal Code Section 628*, at v (Mar. 1990) [hereinafter "*Fourth Annual California School Crime Report*"]. The most alarming reported trend is the increase in weapons possession, including knives, explosives, guns and other weapons (such as clubs, rocks, brass knuckles, and scissors). Over the four-year reporting period, total weapons possession increased 28%, gun possessions shot up 100% and other weapon possessions climbed 54%. Id. at 2 (table 1) (based on the crime rate per average school to take population changes into account). Based on these figures, the Report advised that, "School administrators, parents, and local law enforcement agencies need to give special attention to the increased incidence of weapons possession, especially guns, on the school campus." Id. at vii. While schools have a well-established duty to maintain discipline and order, it is evident that this objective is being hampered by an increasing presence of weapons in schools.

c.     Interest in Safety/Duty to Protect

In this unique, state-mandated forum, the state also has a concomitant duty to protect all students, teachers and school personnel. As the California Supreme Court has stated, "Teaching and learning cannot take place without the physical and mental well-being of the students." *William G*, 40 Cal.3d at 563. Many cases have similarly acknowledged the interest in providing a safe forum for learning. See, e.g., *T.L.O.*, 469 U.S. at 332 n.2 (citing numerous authorities and noting "the interest of the states in providing a safe environment conducive to education in the public schools"); see also id. at 350 (Powell, J., concurring); id. at 353 (Blackmun, J., concurring); *Schaill*, 864 F.2d at 1314 (noting "a school official's primary mission is not to ferret out crime, but is instead to teach students in a safe and secure learning environment"); *Horton v. Goose Creek Independent School Dist.* (5th Cir. 1982) 690 F.2d 470, 480 (same), cert. denied (1983) 463 U.S. 1207 (cited favorably in *William G*, 40 Cal.3d at 563); *Mitchell v. Board of Trustees of Oxford Municipal Separate School Dist.* (5th Cir. 1980) 625 F.2d 660, 664-65 (noting school is "under an obligation to provide a safe environment for the children so they can learn").

---

firearms on public school grounds); Penal Code § 626.10 (prohibiting the possession or bringing of weapons on public school grounds); A.B. 1866, chapter 661 (1991) (amending Penal Code § 186.22) (enhanced punishment for felonies committed by any criminal street gang within 1,000 feet of school grounds); see also Health & Safety Code § 11353.1(a)(2), (5), (f) (enhanced punishment for certain drug offenses occurring within 1,000 feet of school grounds); Juvenile Drug Trafficking and Schoolyard Act of 1988, Health & Safety Code § 11353.6 (enhanced punishment for certain drug offenses occurring within 1,000 feet of school grounds); Health & Safety Code § 11380.1 (a)(2), (f) (similar enhanced punishment).

Other states have similar prohibitions against the use of firearms on or near school grounds. See, e.g., Wis. Stat. § 948.605 (1991) (gun-free school zones statute prohibiting the possession or discharge of firearms within 1,000 feet from school grounds); Mo. Rev. Stat. § 571.030, subsections 1(6), (8) (prohibiting the carrying of a firearm into any school or the discharge of a firearm "within 100 yards of any occupied school house").

Special note of this obligation has repeatedly been made under California law, including the state Constitution, statutes and case law.  Since 1982, pursuant to a ballot initiative, California Constitution article I, section 28(c) has expressly recognized a right to safe schools: "All students and staff of public primary, elementary, junior high and senior high schools have the inalienable right to attend campuses which are safe, secure and peaceful."  (Emphasis added.)  The Legislature has expressly approved several statutes pursuant to this inalienable right in the Education Code.  See Education Code section 32261 (establishing Interagency School Safety Demonstration Act); Penal Code section 627(c) (governing access to school premises); Penal Code section 628.5 (concerning annual school crime report).

Numerous statutes have been enacted to promote school safety and address problems with weapons and crime in schools.  Enhanced penalties may be imposed for the commission of an assault or battery on school property.  Penal Code sections 241.2, 243.2.  It is a felony to bring or possess firearms or weapons on school grounds.  Penal Code sections 626.9, 626.10.  Since 1979, California law has provided procedures for the removal of "injurious objects" from students, including firearms and switchblade knives having a blade over two inches in length.  Education Code section 49330 et seq.  Students may be suspended or expelled from school for possessing "any firearm, knife, explosive, or other dangerous object."  Education Code sections 48900(b), 48915(a)(2); see generally *Fremont Union High School Dist. v. Santa Clara County Board of Education* (6th Dist. 1991) 235 Cal.App.3d 1182 (construing Education Code § 48900).  Law enforcement authorities are required to be notified of student conduct involving the use of firearms or weapons.  Education Code section 48902(a), (b) & (c).  As part of a recognized "duty to provide a safe educational setting," the Legislature has provided general authority for public school guards.  *In re Frederick B.* (1st Dist. 1987) 192 Cal.App.3d 79, 85, 88 (citing Education Code §§ 39670, 39671); see also Education Code section 39670 (noting district school board "may employ personnel as necessary to ensure the safety of school district personnel and pupils and the security of the real and personal property of the school district").  The Legislature has enacted legislation restricting and conditioning the access of unauthorized persons on school grounds in order to safeguard students, school employees and property.  Education Code § 627 et seq.; see also Education Code § 32210 (willful disturbance of a public school or public school meeting constitutes a misdemeanor); Education Code § 32211 (authorizing principal or designee to request non-designated persons to depart public school grounds upon the conclusion that "the continued presence of the person . . . would be disruptive of, or would interfere with, classes or other activities of the public school program").  The Legislature has established a School/Law Enforcement Partnership to administer interagency safe school programs and activities as well as a statewide interagency school safety cadre to reduce, inter alia, school violence and crime.  Education Code section 32262, et seq. & Education Code section 32290, et seq.  A school safety and security resource unit has been created in the Department of Education to assist in combating school crime.  Education Code section 32250 et seq.  Each school is required to adopt regular rules and procedures on school discipline and is also encouraged to develop comprehensive school safety plans.  Education Code section 35291 et seq. & Education Code section 35294 et seq.  In order to ensure that adequate data and information is available on school crime, the Legislature has also mandated annual Department of Education reports compiling current school crime statistics from each school district.  Education Code section 628 et seq.  Teachers also have "a moral duty and a legal obligation" to "`protect[] the health and safety of students'" under the Code of Ethics of the Teaching Profession.  *William G*, 40 Cal.3d at 574 (Mosk, J., dissenting) (quoting Cal. Admin. Code, tit. 5, § 80130); see also Education Code section 58700 et seq. (establishing pilot programs to reduce youth gang violence in elementary and secondary schools).

Independent of these state constitutional and statutory provisions, the California Supreme Court has noted "the right of all students to a school environment fit for learning cannot be questioned. . . .  The school premises, in short, must be safe and welcoming."  *William G*, 40

Cal.3d at 563.[16/] Other California cases have also noted the duty of schools to protect students and school personnel. See, e.g., *Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 806 n.3 (discussing duty of school authorities to supervise and protect students); *Rodriguez v. Inglewood Unified School Dist.* (2d Dist. 1986) 186 Cal.App.3d 707, 715 ("Based on prior case law and the characteristics of public education along with recent statutory pronouncements, we readily come to the conclusion that a special relationship is formed between a school district and its students so as to impose an underline affirmative duty on the district to take all reasonable steps to underline protect its students.") (emphasis added); *Gordon J. v. Santa Ana Unified School Dist.* (4th Dist. 1984) 162 Cal.App.3d 530, 544 (noting "duty of the school administration to protect law abiding students from delinquents among them").

In sum, the school interest in safety and duty to protect students and school personnel is firmly rooted in three separate sources: the state Constitution, statutes, and decisional law. Together, these three independent legal sources establish the specific programs and obligations on schools to foster the goal of safety in school.

### d. Weapons Deterrence

At least one other interest, which is inextricably intertwined with the three aforementioned interests, is the school interest in deterring weapons on school grounds and surroundings. As already noted, according to the most recent school crime report, the increased presence of weapons in schools is having a "disrupt[ive]" impact in fostering an educational environment in many schools. Moreover, California law currently proscribes the bringing or possession of firearms or weapons on school grounds. See Penal Code sections 626.9, 626.10. Weapons clearly have no legitimate role in the education forum except in those rare instances where they are limited to authorized academic or extracurricular programs. See Education Code section 49330 note (section 1(c) of Stats. 1979, c. 210, p. 454). The state and schools have an obvious interest in promoting these statutory objectives and mitigating the potentially debilitating impact weapons have on the primary school mission to teach. As a prophylactic measure, if schools can keep weapons off school grounds to begin with, potentially disruptive or injurious circumstances may be avoided altogether. Moreover, valuable school resources need not be diverted to discipline or otherwise handle or gain control over a potential weapons confrontation. Finally, deterrence promotes and maintains the safety and security of the school.[17/]

### 3. Adequate Safeguards to Minimize the Intrusion

Before balancing these government interests against the intrusion of privacy, a separate Fourth Amendment concern of suspicionless searches is addressed. This requires an evaluation of whether adequate safeguards are employed "to assure that the individual's reasonable expectation of privacy is not `subject to the discretion of the official in the field.'"[18/] The

---

16. *William G* was decided prior to the enactment of the inalienable right to safe schools. See *William G*, 40 Cal.3d at 558 n.5; see also note 10, supra.

17. The interest in deterrence has also been noted in other suspicionless search cases. See, e.g., *Von Raab*, 489 U.S. at 674, 676; *Skinner*, 489 U.S. at 629; *Martinez-Fuerente*, 428 U.S. at 557; *Ingersoll*, 43 Cal.3d at 1331 & 1337 (noting the "primary purpose" of sobriety checkpoints "is to prevent and deter conduct injurious to persons and property").

18. *T.L.O.*, 409 U.S. at 342 n.8 (quoting *Prouse*, 440 U.S. at 654-55); see also *Skinner*, 489 U.S. at 613-14 (The purpose of the Fourth Amendment is to "guarantee[] the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government

consideration of "adequate safeguards" involves an assessment of the reasonableness of the procedures employed to minimize the intrusion on privacy interests. See, e.g., *Von Raab*, 489 U.S. at 672 n.2 (noting specific procedures adopted to minimize intrusion on privacy); *Skinner*, 489 U.S. at 624-27 (same). As will be shown, several suggested procedures can be adopted which minimize unnecessary intrusions into a student's privacy. Many of these safeguards are borrowed from analogous metal detector cases in the airport or courthouse context (which are primarily based upon the Fourth Amendment administrative search doctrine, which is also governed by a standard of reasonableness and is considered in Subsection II(E), infra).

### a. Screening Device

It deserves noting at the outset that metal detectors are employed as a screening mechanism, "used only to determine whether a further physical search is indicated." *Henry*, 615 F.2d at 1229; see also *United States v. Doran*, (9th Cir. 1973) 482 F.2d 929, 932 ("[T]he magnetometer . . . is no more than a gratuitous means by the government to reduce the number of persons searched."); *Lopez*, 328 F. Supp. at 1084 ("Measured against the air travelling population as a whole, [use of the magnetometer and other airport screening methods] is highly effective in narrowing the group which needs particular attention."); accord *Albarado*, 495 F.2d at 808 (noting that "any further investigation after activation of the magnetometer is for the metal which did the activation"). The minimal or insubstantial intrusion of privacy from metal detector scans therefore serves to identify a smaller class of individuals upon whom a further search or inquiry may be warranted. Students who do not activate the metal detector would, therefore, not be subject to any further search.

### b. Prior Notice

One of the most important safeguards to minimize the already minor intrusion resulting from metal detector scans is advance notice of the search, including the use of signs or public announcements.[19] For example, school officials could provide each student and his or her

---

or those acting at their direction."); *Martinez-Fuerte*, 428 U.S. at 554 ("The Fourth Amendment imposes limits on search-and-seizure powers in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals."); *Schaill*, 864 F.2d at 1321 (finding "adequate safeguards" included in suspicionless urinalysis search program of high school student athletes).

Whether adequate safeguards are taken to minimize the intrusion of privacy essentially entails the same evaluation as the second-step of the reasonableness standard mandated under *T.L.O.*: whether "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." 469 U.S. at 341-42.

19. Compare, e.g., *United States v. Pulido-Baquerizo* (9th Cir. 1986) 800 F.2d 899, 902 (airport signs warned passengers of luggage inspection); *United States v. Lopez-Pages* (11th Cir. 1985) 767 F.2d 776, 779 n.2 (sign at airport security checkpoint warning of search); *United States v. De Angelo* (4th Cir. 1978) 584 F.2d 46, 47-48 (signs in airport terminal), cert. denied (1979) 440 U.S. 935; *Edwards*, 498 F.2d at 499, 501 (signs and announcement over airport loudspeakers); *Albarado*, 495 F.2d at 802, 808 (signs posted in English and Spanish throughout airport terminal and at the boarding gate and periodic announcements made in English and Spanish); *Doran*, 482 F.2d at 931 (sign at airport boarding podium and before reaching magnetometer in boarding area and public address announcement); *Lopez*, 328 F. Supp. at 1083 (signs in English and Spanish at airport boarding gates); compare also *Henry*, 615 F.2d at 1229, 1231 (inferring knowledge through increasing public awareness of airport security searches); *United States v. Skipwith* (5th Cir. 1973) 482 F.2d 1272, 1273, 1274 (knew or should've known

parents with written notice prior to the school year that metal detector searches will take place under specified circumstances at schools within the district. As one court has observed, "the offensiveness of the screening process is somewhat mitigated by the fact that the person to be searched must voluntarily come to and enter the search area. He has every opportunity to avoid the procedure by not entering the boarding area." *Skipwith*, 482 F.2d at 1275-76. While students aged six to eighteen are under a statutory compulsion to attend school, see Education Code section 48200, advance notice allows for the removal of items which might otherwise cause embarrassment if revealed during the metal detector scan. Compare *Hyde*, 12 Cal.3d at 175-76 (Wright, C.J., concurring); *Lopez*, 328 F. Supp. at 1083.

c.       Minimizing the Intrusion At Each Juncture

In addition to prior notice, other suggested steps can be employed with the goal of minimizing the intrusion into privacy during each phase of the search. Prior to the metal detector scan, all students may be asked to empty their pockets and belongings of all metal objects. If the metal detector is activated during a walk-through, any expanded search should be as limited as possible consistent with the objective of preventing or deterring the presence of weapons on school grounds and with the noted school interests (e.g., in maintaining discipline and order). For example, after an initial metal detector activation occurs, a second walk-through could be requested. Cf. *Albarado*, 495 F.2d at 803 n.3, 808-09. If a second activation results, a hand-held magnetometer could be used, if available, to focus on and discover the location of the metal source. If the activation is not eliminated or explained, it may then be necessary to expand the scope of the search. Cf. *Wilkinson*, 832 F.2d at 1340 (authorizing use of "magnetometer searches of persons and packages" at Ku Klux Klan rallies "followed by frisks where the magnetometer indicates the presence of metal and the situation cannot be resolved by the use of the magnetometer alone"); *Epperson*, 454 F.2d at 772 (noting after opportunity to remove metal objects and once the activation of the magnetometer at the airport "was not satisfactorily explained," "the subsequent physical `frisk'" was justified and reasonable).

Under the governing test of "reasonableness, under all the circumstances," any greater subsequent intrusion could be minimized by asking the student to proceed to a private area. Compare, e.g., *Lopez-Pages*, 767 F.2d at 779 (intrusion minimized by moving from general airport security area to a private office before proceeding to a pat-down search); *United States v. Moreno* (5th Cir.) 475 F.2d 44, 51 (same), cert. denied (1973) 414 U.S. 840. Any expanded search, such as a request to open purses or bookbags or frisks, could be conducted by school officials of the same sex as the students searched. Further, school officials may be specifically instructed to limit any search to the detection of weapons. Compare *McMorris*, 567 F.2d at 900 (similar instruction concerning courthouse searches); compare also *Albarado*, 495 F.2d at 808 (noting "any further investigation after activation of the magnetometer is for the metal that did the activation; activating the magnetometer is not a general license to search for anything"). Thus, a school official could not use the fact of an unexplained activation to search a container which could not hold a weapon. Cf. *United States v. Kroll* (8th Cir. 1973) 481 F.2d 884, 887 (in airport search, it was unreasonable to examine envelope's contents for possibility of weapons). If no less restrictive alternatives remain available, a limited pat-down might then be necessary.

---

airline passengers were subject to search); *Barrett v. Kunzig* (M.D. Tenn. 1971) 331 F. Supp. 266, 270, 274 (front and rear entrance signs furnishing advance notice of courthouse search), cert. denied (1972) 409 U.S. 914; *Hyde*, 12 Cal.3d at 175-76 (Wright, C.J., concurring) (discussing role of advance notice as a major factor in analyzing validity of the search); cf. *Schaill*, 864 F.2d at 1321-22 (prior written notice and consent forms of suspicionless urinalysis program given to high school student athletes); but see *People v. Dooley* (1st Dist. 1976) 64 Cal.App.3d 502, 513-14 (noting under some circumstances advance notice of an airport luggage search may not be required, such as where an anonymous telephone report of a bomb has been made).

*Albarado*, 495 F.2d at 808. Another relevant factor may include whether the search is subject to supervision and is conducted within scrutiny of the public. *Skipwith*, 482 F.2d at 1276. For purposes of "reasonableness" under the Fourth Amendment, each aspect of the search or invasion of privacy is evaluated separately. See, e.g., *T.L.O.*, 469 U.S. at 343 (evaluating two searches of student's purse separately); see also *Klarfeld v. United States* (9th Cir. 1991) 944 F.2d 583, 586-87 (evaluating separate search concerning request for removal of shoes after magnetometer had activated twice); *Albarado*, 495 F.2d at 805-10 (analyzing use of magnetometer separately from frisk).

These steps, which are only suggestive and not mandatory for all metal detector searches of students, seek to minimize the intrusion of privacy at each phase of any expanded search. This recommended approach permits the deterrence objective of metal detector searches to be attained while respecting the privacy interests at stake. Other steps may be taken which are not mentioned here that also promote these aims. Ultimately, the question of whether a specific search satisfies the standard of "reasonableness, under all the circumstances," will turn on the facts presented in the particular case.

> d.  Indiscriminate Application of
> Established Procedures

One suggested manner of conducting metal detector searches is on an indiscriminate basis. A search which screens every individual or object will not be "subject to the discretion of the official in the field."[20] A fixed, permanent metal detector which is applied to all individuals, of course, eliminates any exercise of official discretion in determining who is searched.[21] Further, any possible stigma associated with a metal detector search dissipates by the even-handed application of the search. *Skipwith*, 482 F.2d at 1275.

---

20. *Camara*, 387 U.S. at 532; compare *Henry*, 615 F.2d at 1228 (non-discriminatory x-ray scan of every object brought to airport boarding gates); *Edwards*, 498 F.2d at 500 (metal detector search applied to everyone and all carry-on baggage); *Albarado*, 495 F.2d at 805 (noting "all passengers are searched" by the magnetometer at airports even though few weapons are detected); *United States v. Davis* (9th Cir. 1973) 482 F.2d 893, 910 (indiscriminate security check of all carry-on luggage); *Barrett*, 331 F. Supp. at 270, 274 (Because the "packages and briefcases of all persons who enter the [courthouse] building, except those who work there and have been issued special identification cards, are inspected" "the inspection is not accusatory in nature.") (emphasis added); compare also 4 W. LaFave, *Search & Seizure, A treatise on the Fourth Amendment* (2d ed. 1987) § 10.6(c), at 18 ("Such a risk [of arbitrary discretion of the official in the field] is not present under the hijacker detection screening system, as all those who pass the check point are subject to the established procedures and those conducting the searches play no part in determining who will choose to include themselves within the group of persons to be screened.").

21. As Justice Stevens has observed:

> Permanent, nondiscretionary checkpoints could be used to control serious dangers at other publicly operated facilities. Because concealed weapons obviously represent one such substantial threat to public safety, I would suppose that all subway passengers could be required to pass through metal detectors, so long as the detectors were permanent and every passenger was subject to the same search.

*Sitz,* 496 U.S. at 473-74 (Stevens, J., dissenting); see also *Hyde*, 12 Cal.3d at 177 (Wright, C.J., concurring).

The absence of a fixed, permanent metal detector, however, does not mean a metal detector scan is necessarily unreasonable, within the meaning of the Fourth Amendment. For example, any potential for arbitrary interference by school officials is eliminated by the even-handed application of the metal detector search to all individuals or objects at the school or event at which the search is conducted. Thus, a school may decide that non-permanent metal detector searches may be warranted only at certain school events (e.g., football games or dances). To promote the interest in safety and to maintain order and discipline, school officials are entitled to some flexibility in determining when and where to use metal detector searches. Cf. *T.L.O.*, 469 U.S. at 340.

e.      Random Application of Established
        Procedures

The reasonableness of random metal detector searches turns on whether adequate safeguards are employed so that metal detector searches will not be "subject to the discretion of the official in the field." The salient factor in considering if a random search is reasonable is whether a uniform, established procedure is employed to all those subject to the search. Where a preestablished administrative plan is followed, the opportunity for officials in the field to exercise arbitrary discretion is diminished or eliminated. See, e.g., *Brown v. Texas* (1979) 443 U.S. 47, 51 (noting that one manner of "assur[ing] that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field" is to require that the search or the seizure is "carried out pursuant to a plan embodying explicit neutral limitations on the conduct of individual officers"); cf. *Ingersoll*, 43 Cal.3d at 1341-42 ("The decision to establish a sobriety checkpoint, the selection of the site and the procedures for the checkpoint operation should be made and established by supervisory law enforcement personnel, and not by an officer in the field. This requirement is important to reduce the potential for arbitrary and capricious enforcement."). As long as the opportunity for arbitrary discretion by officials in the field is purged by procedures established in an administrative policy, random searches may satisfy the requirement of "reasonableness" under the Fourth Amendment.

(1) Schools

The application of metal detector searches to randomly selected schools within a particular school district, where reasonably applied, may further the deterrence objective. School officials may conclude there are no less restrictive alternatives to random metal detector searches to deter the presence of concealable weapons in some instances. Moreover, some school districts may not be able to afford fixed, permanent metal detectors at every entrance in every school.

The best means of protecting against arbitrary discretion is by the even-handed application of metal detectors to all individuals and objects entering the school. While the particular school may have been randomly selected, this approach ensures that the same established procedure is applied to all who pass through. Further, the random selection of a particular school by neutral criteria mitigates the possibility of arbitrary discretion.

(2) Individuals

Correspondingly, it would not be unreasonable under the Fourth Amendment to search randomly students or entrants to the school so long as arbitrary discretion in the field was not employed in selecting which specific persons would be searched. As Judge Friendly has written in the related airport search context, "Since all air passengers and their baggage can thus be constitutionally searched, there is no legal objection to searching only some, thereby lessening inconvenience and delay, provided there is no national or racial discrimination without a rational basis (such as the destination of a particular flight)." *United States v. Bell* (2d Cir. 1972) 464

F.2d 667, 675 (Friendly, C.J., concurring), cert. denied (1972) 409 U.S. 991. Thus, school officials could use neutral criteria to determine that every fifth person entering the school, for example, would be subject to the metal detector scan. This would retain the deterrent objective of the search; eliminate any exercise of official discretion in the field as to determining whether any specific person would be searched; and would minimize inconvenience and delay associated with searching an entire school's population. This approach has been upheld in other suspicionless searches. See *Schaill*, 864 F.2d at 1321 (finding that the urinalysis testing of high school student athletes selected "by drawing numbers on a random basis" ensured that "officials in charge will not exercise any discretion as to who will be chosen"); *Ingersoll*, 43 Cal.3d at 1327, 1342 (upholding sobriety checkpoint detention of every fifth car and supporting the application of "a neutral formula such as every driver or every third, fifth or tenth driver" in order to limit discretion of field officers); accord *Von Raab*, 489 U.S. at 667 (noting that where government officials do "not make a discretionary determination to search based on a judgment that certain conditions are present, there are simply `no special facts for a neutral magistrate to evaluate,' as mandated under a warrant requirement") (citation omitted).

4.       Balancing Test Application

Under recent United States Supreme Court case law, a consideration of the privacy rights and governmental interests in issue dictates the conclusion that individualized suspicion is not mandated under the Fourth Amendment for the reasonable application of metal detectors to deter weapons in schools. First, as noted, a metal detector scan constitutes an insubstantial intrusion of privacy. See *Skinner*, 489 U.S. at 624 (noting role of minimal intrusion on question of whether individualized suspicion is required for particular searches); *T.L.O.*, 469 U.S. at 342 (same); see also Discussion in Subsection II(D)(1), supra.

Second, the use of metal detectors serves as a screening device, isolating a smaller class of individuals who may be subjected to an expanded search. Where a greater intrusion is called for, other safeguards ensure that reasonable procedures are employed to minimize any intrusion and protect against any potential for arbitrary exercise of discretion of officials in the field. See *Prouse*, 440 U.S. at 655 (discussing role of other safeguards); *Martinez-Fuerte*, 428 U.S. at 562 (same). As already discussed, such reasonable steps may include, but are not limited to, prior notice and a request to discard all metal objects before individuals pass through the metal detector; searches by school officials of the same sex as the students searched; and the conducting of more expansive searches out of view of the general student population. Moreover, the adoption of an administrative plan by policymakers to govern metal detector searches eliminates the risk of and potential for arbitrary discretion by officials in the field.

Finally, the use of school metal detectors to deter weapons may constitute one of those "limited circumstances" where "the [school's] need to discover such latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the [minimal] intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion." *Von Raab*, 489 U.S. at 668. Several government interests at stake certainly independently outweigh the minimal intrusion of privacy. See *Von Raab*, 489 U.S. at 668 (applying balancing test); *Skinner*, 489 U.S. at 624; *Martinez-Fuerte*, 428 U.S. at 562. For reasons already stated, the state has what has been termed a "compelling interest" in the education and training of students. *T.L.O.*, 469 U.S. at 350 (Powell, J., concurring); see also Discussion in Subsection II(D)(2)(a), supra. Schools also have a "substantial interest" in maintaining discipline and order in the school forum. *T.L.O.*, 469 U.S. at 339; see also Education Code section 35291.5 (requiring each public school to promulgate discipline rules); Discussion in Subsection II(D)(2)(b), supra. Further, the government interest in safety and the duty to protect students and school personnel is well-established in the California Constitution, statutes and case law. See Discussion in Subsection II(D)(2)(c), supra. Finally, schools have a strong interest in deterring weapons on school grounds. See Discussion in Subsection II(D)(2)(d), supra. A requirement of individualized

22

suspicion for school metal detector searches to detect concealed weapons could frustrate the school's interest in deterring the presence of weapons on school grounds. *Skinner*, 489 U.S. at 624 (noting compelling interests "would be placed in jeopardy by a requirement of individualized suspicion").

Significantly, this conclusion comports with analogous cases outside the school context where individualized suspicion has not been mandated for metal detector searches, compare *Wilkinson*, 832 F.2d at 1332, 1340 (holding individualized suspicion was not required for magnetometer searches conducted at outdoor Ku Klux Klan rallies), as well as with cases in the school setting where more intrusive searches have been permitted without individualized suspicion. Compare *Schaill*, 864 F.2d at 1315-22 (upholding random urinalysis drug testing of high school interscholastic athletes and cheerleaders without individualized suspicion).[22]

     5.       Other Potential Contentions and Issues

In cases sustaining suspicionless searches, the United States Supreme Court and other courts have addressed specific contentions and noted several factors which may bear upon the reasonableness or validity of the search at stake. As will be noted, the reasonable application of metal detector searches satisfies these concerns, including: (a) the relevancy of the incidence of detection; (b) a showing of the prior demonstrated need for the search; and (c) the role of less restrictive alternatives.

     a.       The Relevancy of the Incidence of Detection

One issue involves the use of particular suspicionless searches where the incidence of detection of the harm at stake is low relative to the number of persons searched. This contention was directly addressed by the United States Supreme Court in *Von Raab*, involving a drug-testing program of U.S. Customs Service employees seeking transfer or promotion to specified positions. There, the Court highlighted the substantial deterrence objective involved, noting that where "the possible harm against which the Government seeks to guard is substantial, the need to prevent its occurrence furnishes an ample justification for reasonable searches calculated to advance the Government's goal." *Von Raab*, 489 U.S. at 674-75. In support of this proposition, the United States Supreme Court quoted approvingly the language of Judge Friendly concerning the suspicionless airport searches of individuals and carry-on luggage to deter dangerous conduct in air travel:

> When the risk is the jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane, that danger alone meets the test of reasonableness, so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and with reasonable scope and the passenger has been given advance notice of his liability to such a search so that he can avoid it by choosing not to travel by air.

*Von Raab*, 489 U.S. at 675 n.3 (quoting *Edwards*, 498 F.2d at 500 (emphasis in original)); see also *Albarado*, 495 F.2d at 806 (similar).

---

22. Assuming arguendo, a requirement of individualized suspicion was held to apply to school metal detector searches under the rationale of *T.L.O.* and its progeny (an unlikely proposition in light of the substantial, compelling state interests and minimal intrusion of privacy), such suspicionless searches would nonetheless be reasonable under the administrative search doctrine. This separate exception to the warrant and individualized suspicion requirements normally applied under the Fourth Amendment is considered in subsection II(E), infra.

With regard to the low number of detected weapons in airline search cases, the United States Supreme Court stated, "When the Government's interest lies in deterring highly hazardous conduct, a low incidence of such conduct, far from impugning the validity of the scheme for implementing this interest, is more logically viewed as a hallmark of success." *Von Raab*, 489 U.S. at 676 n.3. Similarly, numerous cases have held that a low incidence of detection does not invalidate the search in the airport or in other contexts.[23]

The same rationale employed in these related suspicionless search cases would result in an identical conclusion from the use of school metal detectors. The minimal intrusion of privacy from the metal detector scan averts the potential for grievous harm, including injury or the loss of life of a minor or school personnel or property damage and the complete disruption of the learning environment. In some instances, the trauma and shock to students and schools resulting from a weapons incident may be among the most scarring and upsetting events imaginable. In this environment, the detection of only a few concealable weapons by detectors in this environment may serve as the best indicia concerning the efficacy of the deterrence objective.

> b.    Demonstrated Need

An associated question concerns whether an articulated demonstration of harm and need must be established before metal detector searches can be employed at a particular school. Certainly, the application of student metal detector searches would be most warranted at schools where a causal nexus of necessity is established (i.e., a history of weapon usage). Before resorting to metal detectors in particular schools or school districts, it is strongly recommended that school administrators make a specific finding why this weapons deterrence system is being adopted. For example, school officials might point to particular incidents involving weapons by students or a developing pattern of weapon usage or presence. Such a finding would allow a court, if necessary, to review the context in which the school decided to adopt a weapons prevention program involving metal detectors.

Although it is highly recommended that schools adopt specific findings identifying the rationale which lead to the employment of metal detectors, a prior pattern of harm resulting from weapons has not been required in related suspicionless search contexts. In evaluating the validity of metal detector searches at specific airports or courthouses, for example, courts have traditionally taken judicial notice of the general harm warranting the use of these metal detector

---

23.  See, e.g., *Sitz*, 496 U.S. at 454-55 (noting low number of drunk driving arrests made through sobriety checkpoints); *Martinez-Fuerte*, 428 U.S. at 554 (noting low rate of apprehension of deportable aliens relative to number of cars passing through permanent border checkpoint); *Schaill*, 864 F.2d at 1320 n.14 (noting "the lack of positive urinalysis results" among high school student athletes in one test "may be as easily explained by the deterrent effect of the urinalysis program as by the absence of any drug usage among" the students); *Albarado*, 495 F.2d at 805 & 806 (noting use of magnetometers at airports "could be viewed as `inefficient' in that all passengers are searched, but only a fraction of one per cent have weapons" and concluding "the use of a magnetometer is a reasonable search despite the small number of weapons detected in the course of a large number of searches"); *Lopez*, 328 F. Supp. at 1097 (noting that given the "substantial interest in preserving the integrity and safety of air travel by preventing hijacking . . . a 6% danger of arms suffices to justify a frisk" for weapons at airport boarding areas under the circumstances); *Ingersoll*, 43 Cal.3d at 1337 ("An absence of arrests does not indicate a sobriety checkpoint is a futile exercise. It more likely indicates that the existence of the checkpoint program has succeeded in inducing voluntary compliance with the law, thus fulfilling the program's primary objective of keeping automobiles operated by impaired drivers off the road.").

searches.[24/]

As a general matter, the pervasive and growing problem of weapons in many California schools is now beyond dispute. The most recent report from the California Department of Education notes a disturbing, unbroken trend of the increasing presence of weapons in public schools. See *Fourth Annual California School Crime Report* (discussing dramatic increase in student weapons possession over four-year reporting period), supra; and Discussion in Subsection II(D)(2)(b), supra. Similarly, recent newspaper articles have reported specific incidents and injuries resulting from students using weapons on or near school grounds.[25/]

---

24. See, e.g., *McMorris*, 567 F.2d at 899-900; *United States v. Homburg* (9th Cir. 1976) 546 F.2d 1350, 1353, cert. denied (1977) 431 U.S. 940; see also *Justice v. Elrod* (7th Cir. 1987) 832 F.2d 1048, 1050 (noting as "a matter of common knowledge" the "metal-detector method of search" employed at the Cook County Circuit Court and upholding courthouse metal detector searches where "there is some reason -- there needn't be much -- to expect that armed and dangerous people might otherwise enter") (emphasis added); *Downing v. Kunzig* (6th Cir. 1972) 454 F.2d 1230, 1231 n.1 (briefcase search at federal courthouse); *The Legal Aid Society of Orange County v. Crosson* (S.D.N.Y. 1992) 784 F. Supp. 1127, 1131 (in upholding the use of metal detectors at state family court, noting that "the absence of [specific reports of violent incidents or weapons at the specific court in question] does not prevent us from viewing the prevention of such incidents as of significant importance" and that the court "does not need to wait until a tragically violent episode occurs as happened at [another court] in 1984 before it can institute magnetometer searches"); *Barrett*, 331 F. Supp. at 269 (in courthouse search case, considering "[e]vidence . . . as to the number of bomb threats in this general area of the country" and receiving "evidence . . . as to bombings in other areas of the country"); *Hyde*, 12 Cal.3d at 166-67 (taking judicial notice of number of reported annual hijackings with regard to airport searches); *Rhode Island Defense Attorneys Ass'n v. Dodd* (R.I. 1983) 463 A.2d 1370, 1372 ("tak[ing] judicial notice that threats of violent acts directed at courthouses and court personnel have given rise to an urgent need for security protections"); 4 W. LaFave, *Search & Seizure* (2d ed. 1987) § 10.7(a), at 39 (noting for courthouse searches "it is not correct to say that the GSA inspection program requires a building-by-building showing of the risk of bombing, any more than the hijacker detection program requires an airport-by-airport showing of the risk of hijacking") (emphasis added); accord *Von Raab*, 489 U.S. at 675 n.3 ("It is sufficient that the Government have a compelling interest in preventing an otherwise pervasive societal problem from spreading to the particular context.").

25. Some cases have based judicial notice in part on current newspaper articles. See, e.g., *Homburg*, 546 F.2d at 1353 & n.5.

A brief review of recent newspaper articles demonstrates the problem and danger of weapons in California public schools. See, e.g., *Increased Alarm Over Guns At School*, San Francisco Chronicle, at A14 (Aug. 3, 1992) (noting during the 1991-92 school year, "38 guns and 51 knives [were] confiscated on public school campuses in Oakland . . . and authorities fear that these weapons represent only a fraction of the lethal hardware being carried by students"); *4 Slain in School Terror*, Sacramento Bee, at A1 (May 2, 1992) (Lindhurst High School tragedy resulting in the shooting of 15 people and killing of 4); *Up to 90,000 U.S. Students Carry Guns, Experts Say*, Los Angeles Times, at A25 (Mar. 26, 1992) (noting during 1990-91, 33 guns were confiscated from elementary students, 137 from junior high school students, and 140 from high school students, in or near the 651 schools of the Los Angeles Unified School District); *Gangs: Appalling Loss of Human Potential*, Sacramento Bee, at A2 (Mar. 14, 1992) (noting "in Sacramento County . . . officials are confiscating more than 40 guns and nearly 300 knives a year on school grounds"); *Van Nuys Man, 18, Charged In Campus Shooting*, Los Angeles Times, at B2, col. 5 (Mar. 4, 1992) (18-year-old was charged with shooting two 15-year-olds during a gang confrontation, involving 5 or 6 shots as school commenced at Robert Fulton Junior High

Published California decisions have also indicated the problems of weapons in schools.[26]

The reason a level of demonstrated need may not have been required in related metal detector cases may be because of some difficulty the court could encounter in attempting to interpose a specific quantum to justify the introduction of metal detectors. For example, in light of the established general and growing problem with weapons in schools, in some circumstances, to mandate that a specific threshold of harm must be crossed to justify the introduction of metal

---

School); *Chula Vista; Student Argument Leads to Stabbing*, Los Angeles Times, at B4 (Feb. 26, 1992) ("An argument between two Chula Vista High School students escalated into a knife fight Tuesday that sent a student to the hospital with a collapsed lung."); *East Bay High School Fans to be Searched*, San Francisco Chronicle, at A19 (Feb. 15, 1992) ("Police confiscated 60 weapons in a record 4,592 calls to Oakland schools from September through the end of January."); *Keep the Police at School*, San Diego Union (Feb. 12, 1992) (editorial) (noting "143 weapons were confiscated, including 24 handguns" during the last school year in San Diego schools); *Student Wounded in Russian Roulette Dies*, Los Angeles Times, at B6 (Jan. 10, 1992) (Gunderson High School sophomore in San Jose shot himself with a .38-caliber revolver playing Russian roulette in school parking lot); *Girl wounded by gunshot at Kennedy High*, Sacramento Bee (Dec. 19, 1991) (noting shooting of 13-year old girl "by teenage boy who apparently fired a pistol on a dare and did not intend to hit anybody"); *School Cops in Elk Grove Call Again for Guns*, Sacramento Bee, at B1 (Dec. 14, 1991) (noting campus police in the Elk Grove Unified School District wish to be armed "because they fear gun-toting youths"); *3 Junior High Youths Plead Guilty in Failed Plot to Kill Fellow Student*, Los Angeles Times, at A26, col.5 (Nov. 26, 1991) (reporting "two 13-year-olds and one 14-year-old were among 11 students accused" of conspiracy to commit manslaughter at Walter Colton Junior High School near Monterey); *Bay Area Teachers Becoming Fearful*, San Francisco Chronicle, at A1 (Nov. 20, 1991) (noting four gun firings in Oakland schools since September and that in 1990-91 "219 students were suspended for possessing weapons" in San Francisco "nearly twice as many as three years ago"); *Eighth-Grader Wounds Himself with Gun Brought by Student*, Los Angeles Times, at B1 (Mar. 13, 1991) (noting accidental incident at Northridge Junior High School and that 354 guns were confiscated from Los Angeles Unified School District during the 1989-90 school year); *Stabbing Makes Schools Rethink Campus Security*, San Jose Mercury, at 4B (Sept. 20, 1990) (noting student knife stabbing at San Jose's Pioneer High School); see also *It's Not Just New York*, Newsweek, at 25, 26 (Mar. 9, 1992) (reporting "almost 3 million crimes occur on or near school campuses every year -- 16,000 per school day, or one every 6 seconds" and noting "[g]un violence is on the rise in schools all over America, and the nation's children are trapped in its path"); *Life-And-Death Lessons; Education: County Schools May Begin Teaching Students About Gun Dangers*, Los Angeles Times, at B1, col.2 (Jan. 27, 1992) (reporting under one estimate 135,000 students bring guns to school every day nationwide); *Headline News: Guns in Schools*, USA Today, at 10A (Nov. 12, 1991) (noting "[u]p to 135,000 guns are carried into schools each day" and listing numerous weapon incidents in schools in California and around the country during 1991); *Detroit Officials Grapple with Increase in School Shootings*, L.A. Times, at 16, col.4 (June 6, 1986) (noting that "the increased ease with which guns are becoming available to teen-agers has worsened the climate of fear in many inner city schools").

26. See, e.g., *Fremont Union High School District*, 235 Cal.App.3d at 1184 (student used a stun gun on another student during student altercation during school lunch period); *Alexander B*, 220 Cal.App.3d at 1577-78 (discovery of machete knife and scabbard held by Grant High School student in Van Nuys); *Frederick B*, 192 Cal.App.3d at 83 (discovery of loaded pistol held by Richmond High School student); *In re Guillermo M.* (2d Dist. 1982) 130 Cal.App.3d 642 (school security agent removed knife with a four-inch blade from possession of minor on public school grounds); see also *Halliman v. Los Angeles Unified School Dist.* (2d Dist. 1984) 163 Cal.App.3d 46, 48 (teacher at Milliken Junior High School hit in head by student who intentionally threw rock).

detectors could unduly tie the hands of school officials pending the occurrence of an unacceptable incident or injury. The proper school authorities must be able to respond whenever a clear and present danger of weapons in schools exists. Concededly, determining when that threshold level of harm has been reached will not always be easy to ascertain. Since schools are charged with the duty of providing a safe learning environment, school officials are in the best position to make this decision. Schools cannot be denied legitimate, proven, preventative means, which are reasonably applied, in order to pursue their missions to: (a) educate and train; (b) maintain discipline and order; (c) provide a safe school environment for learning; and (d) deterring weapons on school grounds. The proper school officials, of course, would have to determine whether their school or school district is an appropriate candidate for metal detector searches or whether alternative safety approaches to deter weapons may be preferred to, or used in conjunction with, metal detectors.

To reiterate, it is highly recommended that an explicit finding be made by school officials stating the reasons for introducing metal detector searches in schools. Analogous case law indicates, however, that a specific weapons accident or incident need not precede the introduction of metal detectors in schools. In order to provide a safe learning forum, school officials may respond to the general harm caused by weapons in their school or school district.

c.    The Role of Less Restrictive Alternatives

The availability of less restrictive alternatives is an important factor concerning the reasonableness of the search but is not dispositive on the validity of a search. In analogous metal detector search cases which were based upon the administrative search doctrine, the United States Court of Appeals for the Ninth Circuit has noted that the availability of less restrictive alternatives alone could make the search in question unreasonable. Relying on United States Supreme Court precedent, other federal courts have now expressly disagreed with this proposition in the metal detectors search context.[27/] In several cases, the United States Supreme Court has clearly held that the mere availability of less restrictive alternatives does not mean a

---

27. The Ninth Circuit has applied a requirement of less restrictive alternatives as a dispositive element. See, e.g., *Klarfeld*, 944 F.2d at 587 (suggesting and remanding on the question whether "[a] method of search which exposes the person searched to substantial embarrassment could well be more intrusive" than other less restrictive alternatives and consequently unnecessary, and noting such a search may rise to the level of a fourth amendment violation); *Davis*, 482 F.2d at 910 ("To meet the test of reasonableness, an administrative screening must be as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it."); but see *Klarfeld v. United States*, (9th Cir. 1992) 962 F.2d 866, 868 (Kozinski, J., dissenting from the denial of rehearing en banc) (noting the panel decision in *Klarfeld* "gives everyone who walks through a magnetometer a constitutional right to choose what particular screening method he would `rather' be subjected to").

By way of comparison, the United States Court of Appeals for the Second Circuit previously imposed a requirement of less restrictive alternatives for metal detector searches. See *Albarado*, 495 F.2d at 806. However, the Second Circuit has recognized under more recent United States Supreme Court authority "this is undoubtedly no longer good law." *Wilkinson*, 832 F.2d at 1340 n.13; see also id. (and cases cited therein) (noting "the consideration of alternative means that might have been employed remains a legitimate factor in fourth amendment analysis" but the mere availability of less restrictive alternatives does not make a search unreasonable) (emphasis added); cf. *Rushton v. Nebraska Public Power District* (8th Cir. 1988) 844 F.2d 562, 567 n.9 (citing United States Supreme Court cases for the proposition that "the Fourth Amendment . . . does not require the government to choose the least intrusive method").

search, including suspicionless searches, is necessarily unreasonable.[28/]

Therefore, under well-established United States Supreme Court precedent, one factor bearing on the reasonableness of the metal detector search is whether the inspection is "confined to minimally intrusive techniques designed solely to disclose the presence of weapons." *Hyde*, 12 Cal.3d at 168; see also *People v. Bleile* (2d Dist. 1975) 44 Cal.App.3d 280, 284-85 (under the circumstances of the airport search, marshal was not required to pass laundry bag through magnetometer before opening bag). As a general rule, less restrictive alternatives should always be pursued in order to minimize the invasion of privacy interests. But in evaluating the "reasonableness, under all the circumstances, of the search," the failure to employ a less restrictive alternative will not alone violate the Fourth Amendment requirement of reasonableness. Moreover, in the school setting, after considering or trying other means to deter weapons in schools, school officials may come to the conclusion that metal detectors are the only less restrictive alternative for their particular school or school district. Cf. *McMorris*, 567 F.2d at 900 (noting magnetometer courthouse search "is less restrictive than alternative methods").

### 6. Conclusion

The analysis set forth in *T.L.O.* and *William G*, and their progeny, provides the most suitable framework for evaluating Fourth Amendment issues concerning school official searches of students. Since the Fourth Amendment test of "reasonableness" is contextual, these cases take into account the unique interests and factors implicated in the school setting, including the special relationship between students and teachers and the primary mission of schools to teach, train, and maintain order and discipline. See *Montoya de Hernandez*, 473 U.S. at 537 (noting "reasonableness" involves a contextual inquiry); *T.L.O.*, 469 U.S. at 337 (same); see also *Skinner*, 489 U.S. at 669 (recognizing that in limited circumstances, which involve "special needs, beyond the normal need for law enforcement," the warrant and probable cause requirements may not apply); *T.L.O.*, 469 U.S. at 351 (Blackmun, J., concurring) (noting "special needs" standard for application of Fourth Amendment in school context); and note 8, supra (discussing application of "special needs" doctrine to schools).

In employing this analysis, the reasonable application of metal detector searches of students by school officials satisfies the test of "reasonableness, under all the circumstances," mandated under the Fourth Amendment for student searches. Metal detectors serve to deter weapons, including concealable weapons which may otherwise be difficult to discover. While school officials must be sensitive to the legitimate privacy interests of students, metal detector searches constitute a minimal intrusion of privacy. Moreover, as discussed, reasonable procedures can be adopted which minimize the intrusion of student privacy and promote the

---

28. See *Skinner*, 489 U.S. at 629 n.9 (and cases cited therein) (noting "insistence on less drastic alternatives" would permit judicial second-guessing); *Illinois v. Lafayette* (1983) 462 U.S. 640, 647 ("The reasonableness of any particular governmental activity does not necessarily or invariable turn on the existence of alternative `less intrusive' means."); *Bell v. Wolfish* (1979) 441 U.S. 520, 559 n.40 (discussing the relevancy of issue and whether metal detection equipment constituted a less intrusive alternative to cavity inspections of pretrial detainees); *Martinez-Fuerte*, 428 U.S. at 557 n.12 (noting a requirement of less restrictive alternatives "could raise insuperable barriers to the exercise of virtually all search-and-seizure powers"); accord *Sitz*, 496 U.S. at 453-54 (noting "for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number" of government officials); *Schaill*, 864 F.2d at 1321 (noting "[t]he school's choice of appropriate means to combat this health and disciplinary problem [through a urinalysis program on student athletes] will not be overturned unless unreasonable in light of available alternatives" and that a supported, "reasonable decision . . . is entitled to considerable deference.").

primary deterrence objective.  Under recent United States Supreme Court case law, individualized suspicion is not required to conduct metal detector searches in schools, given the minimal intrusion of privacy and countervailing school interests.  As previously noted, these school interests include the interest in:  education and training of the students; maintaining discipline and order in the classroom and on school premises; providing a safe, secure environment for learning; and deterring weapons on school grounds.  At stake are not only the privacy interests of a particular student but also the safety concerns of others, including fellow students as well as teachers and other school personnel.  While the *T.L.O.* rationale is best suited for evaluating student searches, this opinion will next consider an <u>alternative</u> legal theory under the administrative search doctrine which has been used to confront Fourth Amendment issues concerning metal detectors in other contexts.

## E.  ADMINISTRATIVE SEARCH DOCTRINE

In a number of limited contexts, the Fourth Amendment administrative search doctrine has been used to conduct searches for a regulatory purpose without a warrant or without any basis to suspect a particular individual of violating the administrative regulation.  <u>See, e.g.,</u> *Camara v. Municipal Court* (1967) 387 U.S. 523; <u>see also</u> *Donovan v. Dewey* (1981) 452 U.S. 594 (upholding federal statute authorizing warrantless inspections of underground and surface mines); *United States v. Biswell* (1972) 406 U.S. 311, 316 (upholding federal statute authorizing warrantless inspections of firearm or ammunition dealers).  Administrative searches, for example, have been used to justify the use of metal detectors to prevent or deter the carriage of weapons aboard airplanes or into courthouses, and for airport searches of quarantined fruits, vegetables and plants.[29/]  As will be shown, the administrative search doctrine provides an <u>independent</u> basis to justify the reasonable application of metal detectors in schools.

### 1.  Discussion

Under the administrative search doctrine, warrantless "searches conducted as part of a general regulatory scheme in furtherance of an administrative purpose, rather than as part of a criminal investigation to secure evidence of crime, may be permissible under the Fourth Amendment though not supported by a showing of probable cause directed to a particular place or person to be searched."  *Davis*, 482 F.2d at 908; <u>see also</u> *Hyde*, 12 Cal.3d at 165; <u>accord</u> *Von Raab*, 489 U.S. at 668 (noting "the traditional probable-cause standard may be unhelpful in analyzing the reasonableness of routine administrative functions, especially where the Government seeks to <u>prevent</u> the development of hazardous conditions or to detect violations that rarely generate articulable grounds for searching any particular place or person") (citations omitted; emphasis in original).  Thus, in the airport context, including the use of metal detectors, "screening searches of airline passengers are conducted as part of a general regulatory scheme in

---

29.  <u>See, e.g.,</u> *Von Raab*, 489 U.S. at 675 & n.3 (citing with approval airport search cases analyzed under the administrative search doctrine); *Klarfeld*, 944 F.2d at 586 (warrantless administrative search to inspect entrants to federal courthouse); *McMorris*, 567 F.2d at 899 (warrantless administrative search to inspect entrants to state courthouse); *United States v. Schafer* (9th Cir.) 461 F.2d 856, 857 (warrantless administrative search to inspect for quarantined agricultural items), <u>cert. denied</u> (1972) 409 U.S. 881; *Owens,* 134 Cal.App.3d at 147 (x-ray examination of checked airport luggage constituted valid administrative search); and cases cited in note 5, <u>supra</u>.

See also 14 C.F.R. §§ 108.9, 121.538 (regulations permitting screening of airline passengers and property); 40 U.S.C. §§ 318-318d (governing the protection of federal buildings); 41 C.F.R. §§ 101-20.301, 101-20.313 (1990) (regulations permitting inspection of packages of persons on or entering federal property, including federal courthouses, and proscribing explosives).

furtherance of an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent hijackings." *Davis*, 482 F.2d at 908; see also *Von Raab*, 489 U.S. at 675 & n.3 (favorably noting application of administrative search doctrine to airport searches).[30/]

Several pertinent lessons and principles may be gleaned from the application of the administrative search doctrine in analogous metal detector cases. First, the central regulatory purpose of administrative searches at airports or courthouses is not to discover and apprehend individuals carrying weapons, but instead to deter the presence of weapons on airplanes or in courthouses. *Davis*, 482 F.2d at 908; *McMorris*, 567 F.2d at 900 (courthouse); *Albarado*, 495 F.2d at 804 (noting deterrence objective of airport searches); *Hyde*, 12 Cal.3d at 166; cf. *Wilkinson*, 832 F.2d at 1341 (noting "the magnetometer searches are justified for the specific purpose of keeping firearms away from [Ku Klux Klan] rallies"). While an administrative search to deter weapons cannot be used as a pretext for other objectives or to enforce criminal laws,[31/] it is well-settled that "evidence inadvertently discovered as part of legitimate airport screening is admissible in court." *$124,570 U.S. Currency*, 873 F.2d at 1247 n.7; see also *Edwards*, 498 F.2d at 500; *Davis*, 482 F.2d at 908; *Schafer*, 461 F.2d at 859; *Hyde*, 12 Cal.3d at 166.

As in other Fourth Amendment contexts, the application of the administrative search doctrine turns on the reasonableness of the search which requires employment of a balancing test.[32/] Under this balancing test, courts have uniformly found that a compelling government

---

30. Prior to the development of a general consensus relying on the administrative search doctrine, many of the early airport cases were decided during a period when courts struggled to apply the existing Fourth Amendment exceptions to the warrant and probable cause requirements to the airport setting. See, e.g., *Albarado*, 498 F.2d at 803-04 (noting difficulty to fit airport searches, including the use of magnetometers, into recognized exceptions to the Fourth Amendment warrant requirement); *Edwards*, 495 F.2d at 498 & n.5 (same); see also *Hyde*, 12 Cal.3d at 169 n.6. For example, some courts based such airport searches in part on a consent theory, see, e.g., *Davis*, 482 F.2d at 915, while other courts, including California courts, expressly rejected such an approach. See, e.g., *Hyde*, 12 Cal.3d at 162 n.2 (and cases cited therein); *Bleile*, 44 Cal.App.3d at 286-87. Other courts based some airport searches under the *Terry* stop-and-frisk theory. See *Davis*, 482 F.2d at 905 n.32 (citing cases); *Hyde*, 12 Cal.3d at 162 n.3 (citing cases); see also 4 W. LaFave, *Search & Seizure, A Treatise on the Fourth Amendment* (2d ed. 1987) § 10.6(b) (discussing the *Terry*-based approach). Other courts rejected a *Terry*-based approach. See *Hyde*, 12 Cal.3d at 165; see also *United States v. $124,520 U.S. Currency* (9th Cir. 1989) 873 F.2d 1240, 1247; *Davis*, 482 F.2d at 905-08.

31. See *$124,570 U.S. Currency*, 873 F.2d at 1245 (flight terminal security policy to report and reward the detection of drugs and substantial amounts of currency to the United States Customs and Airport Police fell outside the administrative search rationale for airport security searches); see also *McMorris*, 567 F.2d at 900 (noting "record is devoid of any indication that the [courthouse magnetometer] search was a mere subterfuge designed to gather evidence to be used in criminal prosecutions"); *Edwards*, 498 F.2d at 500 (noting general concerns over but no finding of pretextual search); *Davis*, 482 F.2d at 909 & n.44 (same); *Schafer*, 461 F.2d at 859 (same); accord *Camara*, 387 U.S. at 537 (noting limited invasion of privacy because search is not "aimed at the discovery of evidence of crime").

32. Fourth Amendment analysis is usually predicated on the balancing of the government and privacy interests at stake, even where multiple legal theories are considered. For example, in considering searches at airports, the California Supreme Court first rejected upholding metal detector searches based upon the stop-and-frisk rationale of *Terry v. Ohio* (1968) 392 U.S. 1. Nonetheless, the court noted the similarity in tests: "It is ironic, therefore, that by adopting the administrative search doctrine to evaluate the validity of airport screening procedures we must

interest in promoting traffic safety, deterring weapons on airplanes, and deterring potential hijackers, outweighed the minimal intrusion of privacy resulting from the use of metal detectors. See, e.g., *$124,570 U.S. Currency*, 873 F.2d at 1243, 1245; *Davis*, 482 F.2d at 910; *Hyde*, 12 Cal.3d at 166-67; see also *McMorris*, 567 F.2d at 899-900 (courthouse). Courts have also held that a warrant requirement to justify the use of metal detectors would frustrate the purpose of the administrative search. See, e.g., *Davis*, 482 F.2d at 910; *Schafer*, 461 F.2d at 858; *Hyde*, 12 Cal.3d at 168-69; accord *Donovan*, 452 U.S. at 603 (noting warrant may not be required for an administrative search if a warrant would frustrate the governmental purpose behind the search); *Biswell*, 406 U.S. at 316 (same); *Camara*, 387 U.S. at 533 (same). Further, courts have held that individualized suspicion is not a prerequisite to metal detector searches under the administrative search doctrine. See, e.g., *Schafer*, 461 F.2d at 859; *Hyde*, 12 Cal.3d at 167; cf. *Schaill*, 864 F.2d at 1316-17 & n.7.[33/]

As with analogous airport and courthouse searches, the administrative search doctrine would similarly permit the reasonable application of metal detectors in schools. See, e.g., *People v. Dukes* (N.Y. City Crim. Court Jan. 31, 1992) 580 N.Y.S.2d 850, 151 Misc.2d 295 (upholding the use of school metal detectors under the administrative search doctrine). The regulatory purpose is the same, only the setting is different. Thus, under this doctrine, metal detectors could be used to deter weapons in schools (analogous to preventing weapons in courtrooms or on airplanes), not to procure evidence of crime. In this manner, as in related cases, the administrative search doctrine advances "the public interest in preventing the introduction of dangerous material into the particular area involved [where it is] sufficiently strong to make it reasonable for the government (without a warrant or traditional probable cause) to condition access by any person seeking to enter the area upon submission by that person to an administrative inspection no more intrusive than necessary to meet the need to exclude the dangerous material from the restricted area." *United States v. Miles* (9th Cir.) 480 F.2d 1217, 1219 (applying administrative search doctrine to army security guards' search of vehicle and its contents prior to entry to an ammunition dump), cert. denied (1973) 414 U.S. 1008.

In employing the balancing test, the compelling state and school interests in: (a) education and training; (b) maintaining discipline and order; (c) providing a safe school environment for learning; and (d) deterring weapons, are all promoted by the reasonable application of metal detectors. See Discussion in Subsection II(D)(2), supra. Analogous to the airport and courthouse cases, these compelling interests outweigh the minimal intrusion in privacy. See Discussion in Subsections II(D)(1) & II(D)(4), supra. As already noted, the reasonable application of metal detectors in schools would include safeguards to respect any invasion of privacy and protect against the arbitrary exercise of discretion of officials in the field. See Discussion in Subsection II(D)(3), supra. For these reasons, the administrative search doctrine supplies an alternative basis to support the reasonable use of metal detectors in schools.

---

undertake a similar process of balancing to that which would have followed from a reliance upon *Terry*." *Hyde*, 12 Cal.3d at 166; see also *Ingersoll*, 43 Cal.3d at 1328 (noting majority and concurring opinion in *Hyde* contained "no real inconsistency" as "both employed a balancing test for reasonableness"); cf. *Camara*, 387 U.S. at 536-37 (noting "there can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails"). Likewise, a balancing test under the administrative search doctrine entails a similar inquiry as employed in evaluating whether individualized suspicion is required for school metal detector searches.

33. Some federal courts have permitted airport searches to be based upon mere suspicion, a standard less demanding than reasonable suspicion or probable cause. See *Lopez-Pages*, 767 F.2d at 778; *Skipwith*, 482 F.2d at 1276 ("mere suspicion of possible illegal activity"). This opinion does not suggest that any standard lower than reasonable suspicion should be employed for school official searches of students, consistent with *T.L.O., William G.,* and their progeny.

2.    The Role of "Qualified Consent" Under the Administrative Search
       Doctrine

Some cases of the United States Court of Appeals for the Ninth Circuit have suggested that metal detector searches under the administrative search doctrine are invalid absent "qualified consent" to the search. See, e.g., *McMorris*, 567 F.2d at 901 (noting search "is performed only after the individual seeking to enter the courthouse has consented, as that term is used in our previous decisions") (emphasis added); see also *Homburg*, 546 F.2d at 1352; *Davis*, 482 F.2d at 913. This issue requires clarification, particularly as applied to the school setting.

The genesis of this requirement is *Davis*, 482 F.2d at 895, 915, where the Ninth Circuit remanded the airport search case for a determination if the required element of consent had been met. In *Davis*, 482 F.2d at 910-11, the court noted that under the duty to employ less restrictive alternatives, "It follows that airport screening searches are valid only if they recognize the right of a person to avoid [the] search by electing not to board the aircraft." (Emphasis added.) To the extent this requirement flows from a duty to apply less restrictive alternatives, "this is undoubtedly no longer good law." *Wilkinson*, 832 F.2d at 1340 n.13; see also Discussion in Subsection II(D)(5)(c) (discussing the role of less restrictive alternatives), supra. Although other courts were able to justify airport and courthouse metal detector searches without any requirement of consent, to some extent, this consent theory under the Ninth Circuit cases may have been predicated on federal executive branch regulations conditioning air travel on consent. See *Davis*, 482 F.2d at 911 & n.51.

Whatever the source of this requirement, the notion of "implied or qualified consent" as a prerequisite to any valid metal detector search under the administrative search doctrine is peculiar in the courthouse or airport context. After all, any election not to be searched results in a hardship or burden, often encumbering or conditioning the exercise of some constitutional rights. For example, under such a consent-based theory, an attorney may be forced to choose between "consenting" to a courthouse metal detector search or failing to discharge professional duties. See *McMorris*, 567 F.2d at 901. Similarly, in order to bypass an airport search, a traveler's right to interstate travel may be unduly burdened. With the purpose of avoiding a courthouse search, some individuals may be compelled to forego the constitutional right to attend public trials. Such a compelled choice between the waiver or foregoing of constitutional rights certainly does not contemplate consent in the traditional application of the term. See, e.g., *Kroll*, 481 F.2d at 886 ("Compelling the defendant to choose between exercising Fourth Amendment rights and his right to travel constitutes coercion."); see also note 50, infra (discussing similar cases).

It, therefore, is not surprising that other courts, including those in California, have rejected or avoided this "qualified consent" theory in applying the administrative search doctrine.[34] California courts, for example, have held that while a passenger can avoid an airport

_____

34. See, e.g., *Hyde*, 12 Cal.3d at 162 n.2; *Edwards*, 498 F.2d at 501; *Albarado*, 495 F.2d at 806-07. As one respected commentator has stated, such a theory of consent "is basically unsound and in any event can hardly be employed, if the established standards of voluntary consent are followed, as a means of justifying all of the [airport] searches which are made in the screening process." 4 W. LaFave, *Search & Seizure, A Treatise on the Fourth Amendment* (2d ed. 1987) § 10.6(g), at 31-32 (footnotes omitted); see also id. at 33 (rejecting "fiction of implied consent"); see also K. Jesmore, *The Courthouse Search* (1974) 21 UCLA L.Rev. 797, 816 (calling the conditioning of "the public's exercise of the right of public access to trials upon an implied consent" theory "untenable").

More recent cases have also circumscribed this notion of "consent" as applied under the Ninth Circuit case law. Thus, in *Pulido-Baquerizo*, 800 F.2d at 902, the Ninth Circuit held:

search altogether by deciding not to travel, *Hyde*, 12 Cal.3d at 169; *People v. Dooley* (1st Dist. 1976) 64 Cal.App.3d 502, 512, once the passenger submits to the search procedures, an election not to board can no longer be made. *Morad v. Superior Court of San Mateo County* (1st Dist. 1975) 44 Cal.App.3d 436, 440-41; *Bleile*, 44 Cal.App.3d at 286; see also *United States v. Herzbrun* (11th Cir. 1984) 723 F.2d 773, 776 & 778 (citing *Skipwith*, 482 F.2d at 1281); *United States v. Haynie* (4th Cir. 1980) 637 F.2d 227, 230-31, cert. denied (1981) 451 U.S. 972, 988; *DeAngelo*, 584 F.2d at 48; but see *Homburg*, 546 F.2d at 1351-52.

The relevance of "consent" in evaluating metal detector searches based upon the administrative search doctrine is not as a determinative element concerning the validity of the search, but instead as one factor bearing on knowledge and acquiescence and the reasonableness of the search. See *Albarado*, 495 F.2d at 808 n.16; *Hyde*, 12 Cal.3d at 176; see also *Edwards*, 498 F.2d at 501; id. at 501 n.1 (Oakes, J., concurring); *United States v. Miner* (9th Cir. 1973) 484 F.2d 1075, 1076 (noting passenger was aware of search through signs and prior travel); *Doran*, 482 F.2d at 932; *Miles*, 480 F.2d at 1219; *Bleile*, 44 Cal.App.3d at 286-87; accord *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 249 (noting "while the subject's knowledge of a right to refuse is a factor to be taken into account, the [government] is not required to demonstrate such knowledge as a prerequisite to establishing voluntary consent"); *Henry*, 615 F.2d at 1229, 1231 (inferring knowledge through general public awareness of airport searches). Normally, advance written notice, signs or other warnings can satisfy this element of notice of the search at stake. See *Pulido-Baquerizo*, 800 F.2d at 902; *Singleton v. Commissioner of Internal Revenue* (3d Cir. 1979) 606 F.2d 50, 52.

Not only is a requirement of consent not mandated under the traditional application of the administrative doctrine, but such a requirement is also not suitable to the use of metal detectors in schools. Since students are compelled to attend school, see Education Code section 48200, it can hardly be said that students may freely elect to avoid a metal detector scan by choosing not to go to school. Consent is therefore not a prerequisite for the validity of school metal detector searches under the administrative search doctrine.

This is not to suggest that consent, or more appropriately foreknowledge or acquiescence, is not a legitimate factor in evaluating the reasonableness of certain school metal detector searches. This factor, for example, may be appropriate as one variable bearing on the reasonableness of the search where compulsion to attend is not present. For example, some entrants to some special events (such as dances or athletic games) would not be compelled to attend. Under these circumstances, prior notice of the search would be relevant to the question of reasonableness.

F.      CONCLUSION

For the foregoing reasons, current case law furnishes at least two independent bases for upholding the reasonable application of metal detectors in schools. First, under the analytical

---

"The requirement in *Davis* of allowing passengers to avoid the search by electing not to fly does not extend to a passenger who has already submitted his luggage for an x-ray scan. . . . A rule allowing a passenger to leave without a search after an inconclusive x-ray scan would encourage airline terrorism by providing a secure exit where detection was threatened. . . . Thus, if a potential passenger chooses to avoid a search, he must elect not to fly before placing his baggage on the x-ray machine's conveyor belt." (Emphasis added). Another Ninth Circuit opinion has recognized, "The true voluntariness of an airport search is doubtful in any event." *$124,570 U.S. Currency*, 873 F.2d at 1248 n.8 (noting coercive aspect of airport searches and that "many travelers would reasonably conclude that they had no realistic alternative" to air travel) (internal quotations and citation omitted).

framework of *T.L.O.*, and other pertinent cases involving student searches by school officials in the school setting, metal detector searches satisfy the Fourth Amendment test of "reasonableness, under all the circumstances." Second, the administrative search doctrine supports the use of metal detectors in schools, as it has in related contexts. As has been shown, individualized suspicion is not a prerequisite under either legal theory. Ultimately, the validity of any metal detector search will depend upon the facts of the particular case in issue. While the reasonable application of school metal detector searches satisfies the requirement of reasonableness under the Fourth Amendment, the remaining question is whether state law imposes separate, more stringent standards which must be satisfied. This question is considered in the next section.

## III. STATE LAW ANALYSIS

In *T.L.O.*, the United States Supreme Court noted that the Fourth Amendment establishes a constitutional floor for protection of privacy interests and that the legitimacy of a search of students by school officials may turn on whether a state has "insist[ed] on a more demanding standard under its own Constitution or statutes." *T.L.O.*, 469 U.S. at 325 n.10. To address this issue, several provisions under the California Constitution and statutes are considered. First, relevant statutory provisions concerning school safety will be noted in order to respond to the submitted question whether any statutory provisions permit the use of metal detectors in schools.

### A. DEVELOPMENT OF SAFE SCHOOL PLANS UNDER EDUCATION CODE SECTION 35294 ET SEQ.

One pertinent statute in the school safety area is Education Code section 35294 et seq., which was enacted in 1989. This statute provides for the development of school safety plans by all public schools (from kindergarten through high school) in cooperation with local law enforcement agencies, community leaders, school personnel, parents and students. Education Code section 35294. No published opinion has been discovered applying this statute.

Among other things, the school safety plan may include an "[a]ssess[ment of] the current status of school crime committed on school campuses and at school-related functions;" the "[i]dentif[ication of] appropriate strategies and programs that will provide or maintain a high level of school safety;" and the "[d]evelop[ment of] an action plan, . . . for implementing appropriate safety strategies and programs." Id. section 35294.1(a). Through this statute, the Legislature has expressed its concern over school safety and has encouraged schools to develop action plans tailored to their campuses which promote safety.

While this statute does not expressly mention the use of metal detectors in schools, consistent with and pursuant to its provisions, a public school could determine that the reasonable application of metal detectors would be an integral or necessary part of its school safety plan. This decision, under the statute, is appropriately made at the local level. In this manner, local school administrators may appraise the suitability and feasibility of using metal detectors on their particular campus. Local decision makers may also determine the role of metal detectors within a comprehensive safety scheme. For example, a determination to use metal detectors may limit their use to special events, such as dances and athletic contests, or may utilize them during regular school hours on a random or permanent basis. Pursuant to this statutory scheme, local school authorities therefore may decide whether and how metal detectors should be used to deter weapons on their campus. If metal detectors are to be employed, this statute provides a vehicle for the development of an administrative policy which may furnish guidance to school officials in the field. See, e.g., Discussion in Subsection II(D)(3)(e), supra (noting importance of preestablished administrative plan to eliminate arbitrary discretion by officials in the field).

### B. REMOVAL OF INJURIOUS OBJECTS UNDER EDUCATION CODE SECTION 49330 ET SEQ.

A separate statute, enacted in 1979, would also permit the removal of weapons through the use of metal detectors. This statute, which has not been the subject of any reported opinions, provides, in pertinent part, that certificated school employees or other designated employees "may take from the personal possession of any pupil upon school premises . . . any injurious object in the possession of the pupil." Education Code section 49331 (emphasis added).

"Injurious object," within the meaning of the statute, includes "objects capable of inflicting substantial bodily damage, not necessary for the academic purpose of the pupil," or a switchblade knife with a blade longer than two inches (pursuant to Penal Code § 653k), or a firearm (within the meaning of Penal Code sections 12001, 12020, or 12220). Under the terms of the statute, injurious object "does not include any personal possessions or items of apparel which a school age child reasonably may be expected either to have in his or her possession or to wear." The removal or taking, as contemplated under the statute, is therefore limited to injurious objects, including weapons. The statute also provides for the retention and return of removed objects. See Education Code sections 49332 - 49334.

Consistent with the provisions of this statute, school officials could employ metal detectors to deter the presence of weapons in school. Under this statute, metal detectors could be used as a screening device, identifying those students who may hold concealed objects containing metal which are capable of inflicting substantial bodily damage. In this manner, metal detectors may help fulfill "the intent of the Legislature to empower school officials and employees to take custody of any injurious object found in the possession of any pupil or any other person on school grounds." Education Code section 49330 note (Section 1(c) of Stats.1979, C. 210, p. 454).

C.    STATUTORY PROHIBITION AGAINST BODY CAVITY AND STRIP SEARCHES UNDER EDUCATION CODE SECTION 49050 ET SEQ.

The Education Code expressly prohibits school employees from conducting certain student searches.[35] This provision, which was enacted in 1988, has also not been the subject of any published California opinions.

Accepted principles of statutory construction supply two directives to guide student searches under this statute. First, its plain language expressly forbids two forms of student searches by school employees: (a) body cavity searches; and (b) searches which would permit a visual inspection of a student's private areas.

---

35. Education Code section 49050 provides:

Prohibited searches

No school employee shall conduct a search that involves:

(a)    Conducting a body cavity search of a pupil manually or with an instrument.

(b)    Removing or arranging any or all of the clothing of a pupil to permit a visual inspection of the underclothing, breast, buttocks, or genitalia of the pupil.

Section 49051 further provides:

Nothing in this article shall be construed to affect the admissibility of evidence in subsequent juvenile or criminal proceedings.

Second, under the traditional rule of statutory construction, *expressio unius est exclusio alterius*, other forms of prohibited searches will not be implied or presumed. See e.g., *Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 195; *Henderson v. Mann Theatres Corp.* (2d Dist. 1976) 65 Cal.App.3d 397, 403 (noting "expression of certain things in a statute necessarily involves exclusion of other things not expressed"), cert. denied (1977) 434 U.S. 825. The provision, entitled "prohibited searches," was drafted to enumerate those student searches which the Legislature sought to proscribe. As a result of the Legislature's specificity in barring two types of student searches, there can be no implied prohibition against other searches, including the use of school metal detectors.

To the extent that reference to the legislative history could possibly become necessary to resolve any statutory construction issues,[36] it would only reinforce this conclusion. As originally introduced on March 6, 1987, A.B. 2496 represented a comprehensive legislative attempt to govern all facets of students searches by school employees. According to the author and other legislative materials, the bill was drafted as a response to the recent *T.L.O.* and *William G* rulings which were viewed as having expanded the ability of school officials to conduct student searches. See, e.g., Senate Committee on Judiciary, Background Report on A.B. 2496, at 2 (Aug. 1988) (quoting author); Assembly Committee on Public Safety, Background Report on A.B. 2496, at 1-2 (May 1987) (same).

In several respects the legislation proposed greater protection from searches for students than that held by adults under existing law. The legislation originally designated "protected pupil areas," including "[a] pupil's body;" "[c]lothing worn or carried by a pupil;" "container[s] used by a student for holding or carrying personal belongings of any kind and in the possession or immediate proximity of the pupil;" and a "school locker, desk, or other receptacle or space on school premises that school employees have issued or assigned to the pupil or that the pupil has selected for the storage of personal belongings of any kind, which the pupil locks or is permitted to lock." Warrantless searches of students and "protected pupil areas" were permissible "only if the school employee has probable cause to believe that the search . . . will produce contraband." Contraband was strictly defined as "an object, the possession of which is either unlawful or a violation of a written school rule and poses a demonstrated danger of being used to inflict substantial harm on the student or others in the school." (Emphasis added). Probable cause was defined to include a requirement that a prudent person "believe that contraband is hidden." As introduced, the bill also contained four prohibited student searches: (a) body cavity searches; (b) strip searches; (c) trained animal searches for detection of controlled substances; and (d) searches of students and protected pupil areas unless conducted by school employees of the same sex. As amended on May 28, 1987, A.B. 2496 would have only permitted student searches by "designated school employees," defined as an "employee with an administrative service credential and who is a full-time public administrator or a public school employee who is a school security officer." (Emphasis added.) After undergoing several amendments, most of these provisions were deleted, resulting in the final enactment of Education Code sections 49050 and 49051. See note 35, supra.

In addition to the express terms of the provision, reference to the legislative history therefore buttresses the conclusion that Education Code section 49050 does not proscribe the use of metal detectors in schools. This is also supported by the rejection of several proposed

---

36. It is well-established that when the statutory language is clear and unambiguous, its plain meaning is employed and there is no further need for statutory construction. See, e.g., *Tiernan v. Trustees of California State University & Colleges* (1982) 33 Cal.3d 211, 218. Normally, it is only where the plain meaning of the language of a statute is not clear and unambiguous (i.e., is susceptible to more than one reasonable interpretation), that extrinsic aides such as the legislative history, may be of greatest utility. See, e.g., *Long Beach Police Officers Ass'n v. City of Long Beach* (1988) 46 Cal.3d 736, 743.

provisions and amendments which would have imposed stringent standards for student searches.[37/] Section 49050 therefore forbids school employees from conducting body cavity or strip searches of students. Through this provision the Legislature established a bright line beyond which school employees could not search. The use of metal detectors in and of itself does not cross this bright line.

> D. SCHOOL DISTRICT AUTHORITY UNDER EDUCATION CODE SECTION 35160 ET SEQ.

California law provides school districts with broad authority to implement programs and activities which are not contrary to law. Pursuant to this authority, school districts may adopt metal detector plans to deter weapons in schools.

Prior to 1976, school districts could only act pursuant to specific statutory grants. See, e.g., *Yreka Union High School District of Siskiyou County v. Siskiyou Union High School District of Siskiyou County* (3d Dist. 1964) 227 Cal.App.2d 666, 670 ("A school district is an agency of limited authority; it may exercise only those powers granted by statute."); see also 63 Ops.Cal.Atty.Gen. 851, 852 (1980).

Pursuant to California Constitution Article IX, section 14,[38/] the Legislature adopted Education Code section 35160, which provides that school districts "may initiate and carry on any program, activity, or may otherwise act in any manner which is not in conflict with or inconsistent with, or preempted by, any law and which is not in conflict with the purposes for which school districts are established." This statute confers upon school districts autonomy and "flexibility" to respond to the "diverse needs" of their local schools. Education Code section 35160.1(a) (clarifying the purpose of § 35160). The Legislature has also specified that the "broad authority to carry on activities and programs" under this statute is to be "liberally construed." Education Code sections 35160.1(b) & (c); see also *Cumero v. Public Employment Relations Bd.* (1989) 49 Cal.3d 575, 591 (noting "broad" powers conferred under § 35160 subject only to statutory preemption); *Hartzell v. Connell* (1984) 35 Cal.3d 899, 916 (construing ballot pamphlet to Cal. Const., art. IX, § 14 to indicate that "the provision would enable the Legislature to relieve itself of the necessity of granting specific authorization for every activity carried out by local school districts"); *Fleice v. Chualar Union Elementary School Dist.* (6th Dist. 1988) 206 Cal.App.3d 886, 890 (referring to § 35160 as "the local control statute"); 69 Ops.Cal.Atty.Gen. 84, 87 (1986) ("School districts now have more responsibility and flexibility in choosing their own programs.").

Two primary limitations have been noted concerning school district authority under section 35160. First, the action may not be contravened or preempted by statute. See, e.g., 60 Ops.Cal.Atty.Gen. 206, 208 (1977) (noting the inquiry under § 35160 is "whether particular

---

37. Cf. *City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 89 (considering rejected language from legislative history to construe breadth of statute); *Morin v. ABA Recovery Service, Inc.* (4th Dist. 1987) 195 Cal.App.3d 200, 207 n.2 (same); *Ford Motor Co. v. County of Tulare* (5th Dist. 1983) 145 Cal.App.3d 688, 691-92 (and cases cited therein); *Berkeley Teachers Ass'n v. Board of Education of Berkeley Unified School District* (1st Dist. 1967) 254 Cal.App.2d 660, 672 (same).

38. This provision, adopted on November 7, 1972, specifies in pertinent part:

> The Legislature may authorize the governing boards of all school districts to initiate and carry on any programs, activities, or to otherwise act in any manner which is not in conflict with the laws and purposes for which school districts are established.

conduct is precluded" instead of whether the conduct is supported by "express or implied authorization"). Clearly, a school district is proscribed from authorizing body cavity and strip searches, expressly prohibited under Education Code section 49050. Second, as noted in the ballot pamphlet to the initiative for Cal. Const. Art. IX, section 14, the school district action must be "related to school purposes." 60 Ops.Cal.Atty.Gen. 177, 179 (1977); see also 71 Ops.Cal.Atty.Gen. 266, 269-70 (1988) (other citations omitted); 64 Ops.Cal.Atty.Gen. 146, 147-48 (1981).

The adoption of metal detector plans by school districts would not transgress either of these two limitations. Further, no statute has been discovered which expressly or impliedly prohibits the use of metal detectors in schools. School districts may therefore decide that the use of metal detectors constitutes one "unique solution" to deterring weapons in schools. Education Code section 35160.1(a). School districts may also determine that metal detectors advance the educational interests of maintaining discipline and order, promoting safety, and providing an environment conducive to learning.

Consistent with section 35160, the Legislature has also authorized school districts to "delegate to an officer or employee of the district any of [its] powers or duties." Education Code section 35161. Further, school districts are expressly authorized to "convene hearings, make findings, and adopt and issue policy statements setting forth the responsibilities of the pupils of that school district regarding . . . attendance, in-school behavior, and any other aspects of school life which the school district governing board may deem relevant to this task." Education Code section 35181.

Collectively, these statutory provisions demonstrate the intent of the Legislature to enable school districts to exercise their discretion to adopt and tailor flexible responses and programs which reflect local education concerns. Pursuant to these provisions, local school districts may determine that the use of metal detectors represents an appropriate local response to deter weapons in their schools.

E.     RIGHT OF PRIVACY

Among the inalienable rights secured by the California Constitution is the right of privacy.[39] The California Supreme Court has held that for searches and seizures in the criminal law context, the "privacy clause has never been held to establish a broader protection than that provided by the Fourth Amendment of the United States Constitution or article I, section 13 of the California Constitution." *People v. Crowson* (1983) 33 Cal.3d 623, 629. The question, then, is whether the privacy clause under the California Constitution supplies a more demanding standard than the Fourth Amendment under the United States Constitution for searches of students by public school officials which are intended to deter weapons on school grounds, not to

_____

39. Cal. Const., art. I, § 1, currently provides:

All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.

The right of privacy was expressly adopted in the California Constitution by the voters in 1972. See Ballot Pamp. Gen. Elect. (Nov. 7, 1972) Proposed Amendments to Constitution, Proposition 11, p. 11, 26-28; *White v. Davis* (1975) 13 Cal.3d 757, 773. By ballot initiative, article I, section 1 was reworded in 1974. See Ballot Pamp. Gen. Elect. (Nov. 5, 1974) Proposition 7, p. 26-27; *White*, 13 Cal.3d at 773 n.9.

gather evidence of criminal law violations.[40/]

While the California Supreme Court has found metal detector scans at airports to be reasonable under the Fourth Amendment, see *Hyde*, 12 Cal.3d at 165-68, (weighing the governmental interest against the intrusion), no California published decision has considered the propriety of metal detector scans under the California Constitution privacy clause. Cf. *Owens*, 134 Cal.App.3d at 147 (x-ray examination of checked airport luggage); *Garrett v. Los Angeles City Unified School Dist.* (2d Dist. 1981) 116 Cal.App.3d 472, 478 (biennial chest x-ray exams of school employees to test for tuberculosis).

The significance of this question cannot be lost. To hold that school metal detector scans are not permissible under the privacy clause could cast in legal doubt the use of metal detectors in other related contexts, including at airports and courthouses. Moreover, in the school setting, any application of metal detector scans may also need to take into account the independent, inalienable right to safe schools under the California Constitution article I, section 28(c), as will be discussed in subsection III(E)(1)(c), infra. Accord *Alexander B*, 220 Cal.App.3d at 1577 (noting, in Fourth Amendment case concerning student search, students' inalienable right to safe schools under California law).

      1.     Balancing Test

Because the privacy clause is not absolute, a balancing test is employed to weigh the state interests advanced by the intrusion against the affected privacy interests. See, e.g., *Wilkinson v. Times Mirror Corp.* (1st Dist. 1989) 215 Cal.App.3d 1034, 1046 (review denied). In applying a balancing test under the privacy clause, California courts have recently split on whether a standard of reasonableness or a stricter compelling interest test should be engaged. Compare id. at 1047 (reasonableness standard) with *Luck v. Southern Pacific Transportation Co.* (1st Dist. 1990) 218 Cal.App.3d 1, 20 & nn.12 & 13 (compelling interest test), modified 218 Cal.App.3d 1492b cert. denied (1990) 111 S.Ct. 344; compare also *Hill v. National Collegiate Athletic Assn.* (1990) 230 Cal.App.3d 1714, 1728 n.7 (noting divergent standards) (review granted). In considering the propriety of school metal detector searches under the privacy clause, both

---

40. If the use of metal detectors in schools arose in the criminal law context, then an analysis under the Fourth Amendment would yield the same result under the right to privacy. See, e.g., *People v. Owens* (1st Dist. 1980) 112 Cal.App.3d 441, 448-49 (noting "the search and seizure and privacy protections [are] coextensive when applied to police surveillance in the criminal context") (emphasis added). Thus, a conclusion that the use of metal detectors satisfied Fourth Amendment standards would dictate that the coextensive standard under the right to privacy would similarly be met. However, as already noted, the Fourth Amendment analysis of the use of metal detectors on students by school officials has been considered outside the criminal law context. See, e.g. *T.L.O.*, 469 U.S. at 341 n.7 (supplying standard for student searches by school officials independent of law enforcement authority); *Griffin*, 483 US. at 873-74 (noting evaluation of school official conduct "presents `special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements"); cf. *Hyde*, 12 Cal.3d at 165 (justifying metal detector search at airport under the administrative search exception "as part of a general regulatory scheme in furtherance of an administrative purpose, rather than as part of a criminal investigation to secure evidence of crime") (internal quotations and citation omitted). Consequently, if the right to privacy analysis outside the criminal law context imposes a more demanding standard than the standard of reasonableness under the Fourth Amendment, it is possible that metal detector scans could satisfy the less demanding standard but not the more exacting one. As will be shown, the use of metal detector scans in schools passes muster under either a compelling interest test or standard of reasonableness under the right to privacy.

balancing standards must therefore be evaluated.[41/]

### a.    Compelling Interest Test

Courts employing a compelling interest test under the privacy clause have weighed whether any compelling interests justify the invasion of privacy interests. See, e.g., *White,* 13 Cal. 3d at 775; *Luck,* 218 Cal.App.3d at 21. Under this standard, several compelling interests would independently justify the insubstantial invasion of privacy resulting from school metal detector scans.

First, the interest in school safety has already been deemed an "inalienable right" in California Constitution article I, section 28(c). Consequently, the people of California, who adopted this provision by initiative in 1982, have already determined that the right to school safety is tantamount to a compelling interest, protecting "[a]ll students and staff of public primary, elementary, junior high and senior high schools." To resolve otherwise would lead to the nonsensical conclusion that a constitutional inalienable right cannot rise to the level of a compelling interest. In fact, Article I, section 28(a), which was enacted along with section 28(c), expressly notes that protecting and encouraging public safety, including safety in schools, is "a goal of highest importance." Moreover, as already noted, this compelling interest in school safety has also been separately recognized by statute and case law.[42/] Thus, there are three independent sources which recognize the state's compelling interest in school safety. Illustratively, as a result of growing concern over weapons in schools, Congress and the Legislature have enacted legislation in recent years to establish safe "school zones," including prohibitions against firearms and weapons on or near schools. See note 15, supra.

---

41. A threshold question concerns whether "privacy," within the meaning of the California Constitution, encompasses metal detector scans. No court has directly confronted this question. However, at least one federal court has held that the right of privacy under California law does not provide a right to possess firearms. *Fresno Rifle & Pistol Club, Inc. v. Van de Kamp*, (E.D.Cal.1990) 746 F. Supp. 1415, 1422, aff'd (9th Cir. 1992) 965 F.2d 723.

Because, as will be shown, the reasonable application of metal detectors in schools does not transgress the privacy clause, this opinion need not reconcile the threshold question of whether privacy rights are implicated by metal detector scans. Other than noting the issue, for current purposes it may be assumed arguendo that the use of metal detectors in schools raises privacy clause concerns.

42. See Discussion in Subsection II(D)(2)(c), supra. Other related Fourth Amendment cases have noted a compelling government interest where safety is in issue. See *Jones v. McKenzie* (D.C. Cir. 1987) 833 F.2d 335, 340 (noting in Fourth Amendment analysis of drug testing of school personnel involved with the transportation of students that "a governmental concern is particularly compelling when it involves the physical safety of the employees themselves or of others") (emphasis added), vacated (1989) 490 U.S. 1001, amended (D.C. Cir. 1989) 878 F.2d 1476; *Henry*, 615 F.2d at 1231 n.10 (noting in Fourth Amendment case, "The need of airport officials to satisfy themselves that it is safe to accept luggage for transportation is compelling") (emphasis added); *Homburg*, 546 F.2d at 1353 (noting "compelling interest" of airport security officers to satisfy themselves that appellant did not have a bomb) (emphasis added); *Epperson*, 454 F.2d at 772 (noting in Fourth Amendment analysis of the use of magnetometers at airports that "[s]uch a search is more than reasonable; it is a compelling necessity to protect essential air commerce and the lives of passengers") (emphasis added); *Barrett*, 331 F. Supp. at 274 (holding courthouse inspections of packages and briefcases did not unduly burden the First Amendment, the Fifth Amendment right against self-incrimination, and the Sixth Amendment right to effective representation of a client by counsel).

It is also relevant that the safety interests in issue involve minor children, including those of kindergarten through high school age. See, e.g., *American Academy of Pediatrics v. Van de Kamp* (1st Dist. 1989) 214 Cal.App.3d 831, 845 (under the right to privacy, "[t]he status of the person [e.g., minor or adult] may be relevant . . . to the question of whether a particular state interest is in fact compelling. Thus, a compelling state interest may justify enacting a statute to afford minors special protections even though the same statute, if applied to adults, would not pass constitutional muster."). In evaluating the safety interest, a court would have to take into account not only the privacy interests of a single student who might object to a metal detector scan, but also the safety interests of other students and school personnel. The compelling interest in school safety alone is sufficient to authorize the use of school metal detectors to prevent weapons in schools.

Second, and related to the safety interest, is a compelling interest in deterring the presence of weapons on school grounds. See Discussion in Subsection II(D)(2)(d), supra. As already noted, a disturbing, consistent trend shows that students are bringing a greater number of weapons to school over each of the last few years during which these statistics have been maintained. The use of metal detectors in schools is intended as a prophylactic measure, not as a means to gather evidence of criminal law violations. Significantly, in some schools, metal detectors may represent one of the least intrusive manners to further this deterrence objective. Cf. *McMorris*, 567 F.2d at 900. Analogously, many cases involving the use of metal detectors at airports and courthouses have noted the interest in deterrence. See, e.g., Id.; *Albarado*, 495 F.2d at 804; *Davis*, 482 F.2d at 908; *Hyde*, 12 Cal.3d at 166.

Third, the state and schools also have what Justice Powell called a "compelling interest" in the education and training of minors. See *T.L.O.*, 469 U.S. at 350 (Powell, J., concurring); and Discussion in Subsection II(D)(2)(a), supra. The use of school metal detectors advances this interest by promoting an environment conducive to learning, the primary mission of the state and schools. School metal detectors also advance other express aspects of the safe school clause concerning "secure" and "peaceful" campuses. Several airport search cases involving the use of metal detectors have noted that many airline passengers often welcome the minimal intrusion of privacy from metal detectors in order to promote their peace of mind and actual feeling of security and safety. See, e.g., *Edwards*, 498 F.2d at 500; *Epperson*, 454 F.2d at 772; *Hyde*, 12 Cal.3d at 167; id. at 177 (Wright, C.J., concurring). Similarly, the increased fear of school children attributable to the increased presence and use of weapons on school campus may be dissipated by the reasonable use of metal detectors. See, e.g., *Student Searches Yielded Fear*, USA Today, at 1A (Nov. 12, 1991) (one seventh-grader noting in Indianapolis junior high school random metal detector search that she would "rather be searched than be shot by someone").

Fourth, and concomitantly, the United States Supreme Court has discussed the state's "substantial" or compelling interest in "maintaining discipline in the classroom and in school grounds." *T.L.O.*, 469 U.S. at 339; see also Discussion in Subsection II(D)(2)(b), supra. Once again, this concern is also protected by the inalienable right to "safe," "secure" and "peaceful" school grounds. Unarmed school personnel may lose control of the school grounds if confronted by armed students. Further, the discovery of weapons held by students may come too late to avert a confrontation, or worse yet, an injury. School metal detectors, used largely as a prophylactic measure, therefore promote the compelling interest in maintaining discipline on school campuses.

Finally, the conclusion that the compelling interest test is satisfied by the use of school metal detectors follows from case law involving the use of similar scanning equipment in schools. In *Garrett*, 116 Cal.App.3d at 478, the Second District Court of Appeal rejected an argument that a required biennial chest x-ray exam of school employees to determine that such persons are free of active tuberculosis did not satisfy a compelling state interest. The court concluded that "chest x-rays for teachers and even students is constitutional as a health measure for the protection of society." Id. at 480. In applying the *Garrett* holding, school metal detector

scans would satisfy corresponding compelling school safety interests, particularly when x-ray scans are considered more intrusive than metal detector or magnetometer scans. Cf. *Henry*, 615 F.2d at 1227.

Analogously, in *Owens*, 134 Cal.App.3d at 147, the Second District Court of Appeal considered the use of an x-ray examination of checked airport baggage. In upholding the x-ray scan, the court weighed "the gravity of the public danger sought to be prevented" against "the personal interest in privacy (expressly protected in California by section 1, of article I of the state Constitution)." Id. (parentheses in original). The court evaluated the "minimal invasion of privacy" imposed against the fact that "the risk of loss of both property and life from the checking of explosive and similar destructive material is great." Id. These cases, involving the more intrusive x-ray examination (which is generally more revealing than metal detectors), lend further support for the proposition that school metal detectors, reasonably applied, do not violate the privacy clause.[43]

In light of each of these independent compelling interests and current precedent, the use of school metal detectors easily satisfies the stringent standard under privacy clause analysis. Only if a court concluded otherwise would it become necessary to consider the more complicated question of how the inalienable right to safe schools would affect the overall analysis. Before turning to this issue, the less-demanding reasonableness standard under the privacy clause is briefly considered.

### b. Reasonableness Test

---

43. Most right to privacy cases have employed a traditional balancing test, weighing the existence of a compelling state interest against the intrusion into privacy. See, e.g., *White*, 13 Cal.3d at 775. A smaller class of cases has applied the three-prong *Bagley* test (under the "doctrine of unconstitutional conditions") to those situations where the receipt of some public benefit is conditioned upon the waiver of a constitutional right. See, e.g., *Committee to Defend Reproductive Rights v. Myers* (1981) 29 Cal.3d 252, 257; *Parrish v. Civil Service Comm'n of the County of Alameda* (1967) 66 Cal.2d 260, 271. Under *Bagley*, to uphold the conditions on the pubic benefit, the state must establish that:

(1) "the imposed conditions relate to the purposes of the legislation which confers the benefit or privilege;"

(2) "the utility of imposing the conditions . . . manifestly outweigh[s] any resulting impairment of constitutional rights;" and

(3) there are no "less offensive alternatives" to achieve the state's objective.

*Myers*, 29 Cal.3d at 257-58 (quoting *Bagley v. Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 505-07).

First, it is questionable that the *Bagley* test would apply since public education is not considered a benefit. See, e.g., *Plyler*, 457 U.S. at 221. Second, assuming arguendo it was applicable, the *Bagley* test alone would also be satisfied by school metal detector searches. Cf. *Akin v. Board of Education of Riverside Unified School District* (4th Dist. 1968) 262 Cal.App.2d 161, 169 (*Bagley* test satisfied and upholding "good grooming policy" challenged by 15-year old high school student who refused to shave his beard), cert. denied (1969) 393 U.S. 1041. Nonetheless, any proper application of the *Bagley* test to school metal detector scans must also take into account the inalienable right to safe schools, under California Constitution article I, § 28(c). This issue is considered in subsection III(E)(1)(c), infra.

In construing California Supreme Court case law, at least one appellate court has recently held that "even if challenged conduct has some impact on the right of privacy, as long as that right is not substantially burdened or affected, justification by a compelling interest is not required. Instead, the operative question is whether the challenged conduct is reasonable." *Wilkinson*, 215 Cal.App.3d at 1047; see also *Schmidt v. Superior Court* (1989) 48 Cal.3d 370 (cited in *Wilkinson*, 215 Cal.App.3d at 1047); *Miller* v. *Murphy* (1st Dist. 1983) 143 Cal.App.3d 337.

After surpassing the more stringent requirements of the compelling interest test, a school metal detector scan would certainly satisfy the reasonableness test under the privacy clause. Under the *Wilkinson* formulation, a metal detector scan constitutes an insubstantial intrusion into privacy. See, e.g., *Albarado*, 495 F.2d at 806 (noting "absolutely minimal invasion of privacy involved" by use of magnetometers); *Valenzuela*, 151 Cal.App.3d at 186 ("The use of a walk-through metal detector [under the Fourth Amendment] is one of the least intrusive searches."); see also Discussion at Subsection II(D)(1), supra, and cases cited therein. This conclusion is unavoidable when contrasted with the invasion of privacy in issue in other privacy clause cases which have employed a test less stringent than the compelling interest standard,[44] as well as under compelling interest test cases.[45] In sum, under the reasonableness test employed in *Wilkinson*, the impact, if any, on the right of privacy from metal detectors is not substantially affected and school metal detectors are unequivocally warranted by the state interests previously discussed.

c.       Consideration of the Inalienable Right to Safe       Schools

The inalienable right to safe schools was adopted by the electorate as part of Proposition 8 on June 8, 1982. See *Brosnahan v. Brown* (1982) 32 Cal.3d 236. By its express terms, this constitutional right "to attend campuses which are safe, secure and peaceful" is guaranteed to "[a]ll students and staff of public primary, elementary, junior high and senior high schools." Cal. Const. art. I, section 28(c) (emphasis added).[46] Article I, section 28(a) reiterates that the right of

---

44. See *Schmidt,* 48 Cal.3d at 390 (mobilehome park rule limiting residence to persons 25 years or older did not violate constitutional right to family privacy as it was neither irrational nor arbitrary); *Wilkinson*, 215 Cal.App.3d at 1047, 1051 (employer's preemployment drug testing policy did not violate constitutional right to privacy under reasonableness test); *Miller*, 143 Cal.App.3d at 346-48 (municipal pawnbroker regulations requiring customers' fingerprints did not violate constitutional right to privacy under reasonableness test).

45. See *White*, 13 Cal.3d at 776 (complaint stated a prima facie violation of the right to privacy under the compelling interest test where police officers posed as university students to make covert records of professors and students); *Hill*, 230 Cal.App.3d at 1747 (drug testing of college athletes during championship competitions violated right to privacy by failing compelling interest test) (review granted); *Luck*, 218 Cal.App.3d at 20-24 (railroad computer programmer employee termination for failing to submit to unannounced drug testing violated constitutional right to privacy under compelling interest test).

46. The same constitutional provision which confers the inalienable right to "pursu[e] and obtain[] privacy" also secures the inalienable right to "pursu[e] and obtain[] safety." See note 39, supra. Unlike the relatively recent constitutional right of privacy, this inalienable right has been part of the California Constitution since its adoption. See *Constitution of the State of California, Annotated* (1946) p. 1429.

While few California cases have considered and applied the inalienable right of safety, this provision could similarly be implicated by an unavoidable conflict with the privacy clause. See *Brosnahan*, 32 Cal.3d at 259-60 (rejecting argument that the safe schools clause could wreak

"public safety extends to public primary, elementary, junior high, and senior high school campuses, where students and staff have the right to be safe and secure in their person."

As the California Supreme Court has noted, one of the objectives of this constitutional amendment was to "provid[e] safety from crime to a particularly vulnerable group of victims, namely school pupils and staff." *Brosnahan*, 32 Cal.3d at 247; see also id., at 248 (noting "the right to safety encompassed" under the safe schools clause "was intended to be, is aimed at, and is limited to, the single subject of safety from <u>criminal</u> behavior") (emphasis in original); id. at 247 (noting another objective of Proposition 8 was to "achiev[e] . . . more effective <u>deterrence</u> of, criminal acts") (emphasis added). As previously noted, the Legislature has already determined that the possession of firearms or weapons on school grounds is a felony, <u>see</u> Penal Code sections 626.9, 626.10, and that "injurious objects" may be removed from students. <u>See</u> Education Code section 49330 <u>et seq</u>. The use of metal detectors in schools may therefore serve to deter weapons in schools and provide safety from this felonious behavior.

One potential question is what effect, if any, this inalienable right may have on the analysis under the separate inalienable right to privacy. No published opinion has confronted a direct conflict between these two provisions. A conflict from the application of the two provisions would be irreconcilable if, for example, the use of metal detectors in schools, consistent with the constitutional right to safe schools, failed to satisfy the compelling interest test under the constitutional right to privacy. In this unexpected circumstance, to favor either of the constitutional provisions at the expense of the other, would fail to give full effect to an "inalienable" right. <u>See</u> *Fields v. Eu* (1976) 18 Cal.3d 322, 328 (noting constitutional construction should "give effect to the scheme as a whole"). This would be tantamount to concluding that one student's inalienable right to privacy from metal detector scans is paramount to another student's or teacher's inalienable right to safe schools, promoted by the minimally intrusive metal detector scans in schools. Under this construction, the inalienable right to safe schools would be subjugated to the right of privacy and the electorate's will to secure the right to safe schools could, in many instances, be unattainable.

In the unanticipated event that this constitutional conflict cannot be avoided, <u>c.f</u> *People v. Williams* (1976) 16 Cal.3d 663, 667 (noting general rule that courts "do not reach constitutional questions unless absolutely required to do so to dispose of the matter" presented), traditional principles of constitutional construction must be utilized to resolve this more complicated and novel legal question. In construing the voters' intent in adopting constitutional provisions through the initiative power, the language is first considered. *Mutual Life Ins. Co. v. City of Los Angeles* (1990) 50 Cal.3d 402, 407; *Lungren v. Deukmejian* (1988) 45 Cal.3d 727,

---

financial havoc on schools and noting "the implementation of comparably broad constitutional rights, such as the right to pursue and obtain 'safety' (Cal. Const., art. I, § 1) has not produced any such financial ruin") (emphasis omitted); *County of Alameda* v. *Superior Court* (1st Dist. 1987) 194 Cal.App.3d 254, 261 (compelling disclosure of identity of mental patient who allegedly raped another for use in a personal injury action and noting the case implicated, in part, the "personal constitutional right to pursue and obtain safety"); cf. *Melvin* v. *Reid* (1931) 112 Cal.App. 285, 291 (relying on the substantive inalienable right to pursue and obtain happiness under art. I, § 1, to support a claim for a right of privacy for money damages).

One appellate court has stated the inalienable right to safety does not confer "a private right of action for damages or an affirmative duty on the part of the state." *Clausing v. San Francisco Unified School Dist. 1st Dist.* (1990) 221 Cal.App.3d 1224, 1237 n.6 (review denied). This conclusion is unfounded for at least three reasons. First, the reference is dicta. Second, the opinion fails to take into account the above-cited cases which have treated the right to safety as a substantive right. Finally, the cited authorities by the *Clausing* court do not support the proposition asserted and do not pertain to the specific constitutional right to safety.

735. Reference to the plain language of the privacy clause and safe schools clause does not reveal that either is intended to have greater weight over the other. See *Assembly v. Deukmejian* (1982) 30 Cal.3d 638, 661, cert. denied and appeal dism'd (1982) 456 U.S. 941. Indeed, both are specified to be "inalienable" rights guaranteed under the constitution. Both were adopted as amendments to the constitution through the initiative power.

Since the plain meaning of the language fails to resolve the issue, resort to other tools of constitutional construction is necessary. It is well-settled that constitutional provisions should be harmonized where possible, to avoid any potential conflict. See, e.g., *Lungren*, 45 Cal.3d at 735; *Serrano*, (1971) 5 Cal.3d at 596. The duty to harmonize is a corollary to the presumption against implied repeals. See, e.g., *In re Thierry S.* (1977) 19 Cal.3d 727, 744 (noting doctrine in statutory context). Both doctrines establish rules of constitutional construction intended to give full effect to every part of the constitution. *In re Lance W.* (1985) 37 Cal.3d 873, 887 (noting presumption against implied repeal requires maintaining integrity of both enactments); *Penziner v. West American Finance Co.* (1937) 10 Cal.2d 160, 176 ("where a modification will suffice, a repeal will not be presumed."). The presumption may be overcome if the two provisions in issue are "irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation." *Penziner*, 10 Cal.2d at 176; *Lance W*, 37 Cal.3d at 886. The presumption also does not operate where a contrary intent is clearly expressed. Cf. *People v. Harris* (1989) 47 Cal.3d 1047, 1082 ("The presumption . . . has no application when the language is clear and does not permit a contrary understanding."). These principles may permit the harmonization of the two constitutional provisions.

The constitutional construction must also take into account the use of the initiative power, under California Constitution article IV, section 1, which has been repeatedly called "one of the most precious rights of our democratic process." *Amador Valley Joint Union High School Dist. v. State Board of Equalization* (1978) 22 Cal.3d 208, 248 (citations and internal quotations omitted). Consequently, the initiative power is liberally construed, jealously guarded, and any reasonable doubts are resolved in favor of the exercise of this right. Id; see also *Kennedy Wholesale, Inc. v. State Board of Equalization* (1991) 53 Cal.3d 245, 250; *Brosnahan,* 32 Cal.3d at 241.

In construing constitutional provisions adopted through the initiative power, one long accepted extrinsic aid is the election brochure pamphlet, which may constitute the only legislative history of a constitutional amendment adopted through the initiative power. See, e.g., *White*, 13 Cal.3d at 775 (right of privacy). In addressing issues of constitutional interpretation, the brochure arguments, analysis by the Legislative Analyst, and title and summary prepared by the Attorney General may be considered.[47]

---

47. See, e.g., *Legislature v. Eu* (1991) 54 Cal.3d 492, 504 (noting the analysis and arguments contained in the ballot pamphlet may be considered to resolve ambiguities in the language), cert. denied (1992) 112 S.Ct. 1292, 1293; *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 803 & nn. 13 & 14 (considering ballot pamphlet argument and Legislative Analyst's Statement); *Harris*, 47 Cal.3d at 1082 n.16 (considering analysis of Legislative Analyst for article I, § 28(d)); *Lungren*, 45 Cal.3d at 740 n.14 (noting "well settled" "rule that the ballot pamphlet is an important aid in determining the intent of the voters in adopting a constitutional amendment"); *Long Beach City Employees Ass'n v. City of Long Beach* (1986) 41 Cal.3d 937, 943 n.5 (noting long practice in considering ballot arguments "as an aid in construing constitutional amendments adopted via the initiative process); *Lance W*, 37 Cal.3d at 888 (considering analysis of Legislative Analyst for article I, § 28(d)); *Los Angeles County Transportation Comm. v. Richmond* (1982) 31 Cal.3d 197, 203 (noting ambiguities in an initiative "may be resolved by referring to the ballot summary, the arguments and analysis presented to the electorate"); *Amador*, 22 Cal.3d at 245-46 (same); *White*, 13 Cal.3d at 775 & n.11 (and cases cited therein) (considering brochure arguments); *Methodist Hospital of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 695 (noting ballot

A review of the Ballot Pamphlet before the voters who considered Proposition 8 establishes three pertinent points concerning the safe schools clause. First, the title, summary, analysis by the Legislative Analyst, and arguments clearly state that the proposals contained in the initiative, including the safe schools cause, were drafted to amend the state constitution. See Ballot Pamp. Elec. (June 8, 1982), official title and summary, analysis by the Legislative Analyst, rebuttal to argument in favor of Proposition 8, p. 32, 34, reprinted in 32 Cal.3d 300; see also Brosnahan, 32 Cal.3d at 261 (holding that Proposition 8 constituted a constitutional amendment and not a revision). The electorate therefore sought, through Proposition 8, to change the rules and rights previously secured by the Constitution.

Second, in the proposal to amend the Constitution, the Ballot Pamphlet noted, "The Constitution currently provides that all people have the inalienable right of `pursuing and obtaining safety, happiness, and privacy.'" Id. analysis by the Legislative Analyst, p. 32 (emphasis added). A major objective of the initiative was to "add" a new inalienable right to safe schools. Id; see also id., p. 33 (preface of text of proposed law and text noting safe schools clause "proposed to be added" to Constitution). The voters were therefore aware that the new inalienable right to safe schools would supplement existing inalienable rights expressly secured by the constitution, including the right of privacy. This conclusion from the Ballot Pamphlet is corroborated by an Assembly Committee Report on Proposition 8, which noted the addition of the inalienable right to safe schools to other inalienable rights. Assembly Committee on Criminal Justice, Analysis of Proposition 8, The Criminal Justice Initiative, at 7 (Mar. 24, 1982) (Report to the California Legislature) [hereinafter "Assembly Committee Report"].[48/] The constitutional modification was therefore being made in the context of existing privacy rights.

Third, one of the anticipated consequences of the safe schools clause was an incalculable increase in claims resulting from the "enforcement of the right to safe schools," and an "increase in school security costs to provide safe schools." See id. summary and analysis by the Legislative Analyst (discussing fiscal effect), p. 32, 55; see also id. argument against Proposition 8, p. 35 (anticipating "court battles over compliance" with the "`safe schools' section"). This conclusion is once again buttressed by the Assembly Committee Report, which also anticipated that the courts would be called upon to enforce the right to safe schools. See Assembly Committee Report, at 7-8, 70. Enforcement of the safe schools clause was clearly contemplated.[49/]

---

pamphlet arguments for and against initiative in ascertaining intent of the electorate); see also Hutnick v. United States Fidelity & Guaranty Co. (1988) 47 Cal.3d 456, 465 n.7 (noting "the rationale for considering voter materials when construing an initiative measure" is that "it is reasonable to infer that those who actually voted on the proposed measure read and considered the materials in explanation of it, and that the materials therefore provide some indication of how the measure was understood at the time by those who voted to enact it").

48. In construing Proposition 8, the California Supreme Court has made reference to this report in the past. See Lance W, 37 Cal.3d at 886 n.6.

49. While the safe schools clause is without question mandatory, see, e.g., Clausing, 221 Cal.App.3d at 1236, some courts of appeal have held it is also not self-executing, i.e., it is not enforceable because no private cause of action for damages has been established. See id. at 1236-38; Leger v. Stockton Unified School Dist. (3d Dist. 1988) 202 Cal.App.3d 1448, 1456; see generally Taylor v. Madigan (1st Dist. 1975) 53 Cal.App.3d 943, 951 (noting a constitutional provision may be mandatory without being self-executing). With regard to this determination that the safe schools clause is not self-executing, several points must be kept in mind.

First, a strong argument can be made that the safe schools clause is self-executing. For example, these decisions failed to consider the noted enforcement language from the Ballot

Based upon this legislative history, the central question to be reconciled is to what extent, if any, the new inalienable right to safe schools qualified the preexisting inalienable right to privacy. Obviously, the inclusion of a separate, new inalienable right devoted to a special, specific subject area reflects the electorate determination that preexisting rights were insufficient to address unique concerns over school safety. The voters decided that only by: (1) amending the constitution, and (2) establishing a new, fundamental right -- of the status of an inalienable right -- could school safety concerns be adequately addressed. To give full meaning to this determination of the voters, some comportment and accommodation would have to be made where this new, specific inalienable right conflicted with others. If the inalienable right to safe schools is to have meaning and be given force, no other construction appears permissible. This conclusion is further supported by general arguments in the Ballot Pamphlet that Proposition 8 would affect privacy rights. See id. rebuttal to argument in favor of Proposition 8 ("If you care about your privacy . . . vote no on Proposition 8.") (emphasis omitted).

Moreover, either to avoid a constitutional conflict or where such a conflict is unavoidable, "a recent specific [constitutional] provision is deemed to carve out an exception to and thereby limit an older, general provision." *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 371, modified (1991) 54 Cal.3d 611a; *Lance W*, 37 Cal.3d at 887 ("The general rule is that courts assume from a new enactment [through the initiative power] a purpose to change existing law."); see also *People v. Valentine* (1986) 42 Cal.3d 170, 181; *Serrano*, 5 Cal.3d at 596; *People v. Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 637, appeal dism'd (1954) 348 U.S. 859; *Rose v. State of California* (1942) 19 Cal.2d 713, 723-24. The right to safe schools, adopted by initiative ten years after the right of privacy was incorporated into the Constitution, is more specific and narrower than the broader, general right of privacy. See, e.g., *Rose*, 19 Cal.2d at 724 ("A specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, although the latter, standing alone, would be broad enough to include the subject to which the more particular provision relates."). Accordingly, the last specific expression of the electorate should prevail.

As a mandatory provision, all branches of government, including the judiciary, must comply with the safe schools clause and are prohibited from contravening it. See *Clausing*, 221 Cal.App.3d. at 1236; *Leger*, 202 Cal.App.3d at 1454; see also Cal. Const. art. I, section 26 ("The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise."); *Mosk v. Superior Court* (1979) 25 Cal.3d 474, 493 n.17.

As Justice Mosk suggested in *William G*, where such a conflict exists, an accommodation must be reached:

---

Pamphlet and Assembly Committee Report. This issue has yet to be definitively determined by the California Supreme Court.

Second, even if the California Supreme Court agreed that the provision was not self-executing, the safe schools clause cannot be disregarded in the right to privacy analysis. It is a mandatory provision. As noted, under well-established principles of constitutional construction, a possible conflict must be avoided and the provisions must be harmonized. Finally, to discount the inalienable right to privacy is to discount the will of the electorate which adopted this right. See, e.g., *Brosnahan*, 32 Cal.3d at 241 (noting the initiative process must be jealously guarded and is "one of the most precious rights of our democratic process") (internal quotation and citation omitted).

Third, even if the provision is deemed not self-executing, there is still an open question whether a cause of action may be inferred from the Constitution. See *Leger*, 202 Cal.App.3d at 1457 n.4 (noting open issue); accord *Rodriguez v. Inglewood Unified School Dist.* (2d Dist. 1986) 186 Cal.App.3d 707, 722 (not reaching the question whether liability may be predicated upon the safe schools clause).

47

Of course we must be alert to protecting the legitimate rights of students who are suspected of criminal activity or violation of school regulations. However, we <u>must also realize that innocent, law-abiding students have a constitutional right to protection from crime and criminals, and are entitled to a safe school environment</u>. The people of California made that clear when they adopted article I, section 28, subdivision (c), of the Constitution.

*William G*, 40 Cal.3d at 574 (Mosk, J., dissenting) (emphasis added); <u>see also</u> *Alexander B*, 220 Cal.App.3d at 1577 (applying safe schools clause in Fourth Amendment student search case); *Gordon J*, 162 Cal.App.3d at 544 (noting "duty of the school administration to protect law abiding students from delinquents among them," based upon, <u>inter alia</u>, safe schools clause, and holding that the exclusionary rule is inapplicable in high school disciplinary proceeding).[50]

Thus, the inalienable right to safe schools would affect the privacy clause analysis in at least one significant respect. This constitutional provision affects the initial determination of whether a compelling interest test should be applied. Rigid application of the compelling interest test would deprive the electorate of its determination to allow for the inalienable right to safe schools. In the event that a compelling interest test fails to harmonize or take into full account the independent, subsequent constitutional inalienable right to safe schools, the compelling interest test should be confined, as it has under current case law, to those cases which do not present a constitutional conflict between two inalienable rights.

F.    UNREASONABLE SEARCHES UNDER THE CALIFORNIA
        CONSTITUTION

California Constitution article I, section 13 contains language which is virtually identical to the Fourth Amendment under the United States Constitution. <u>Compare</u> note 6, <u>supra</u>.[51]   In *Lance W*, 37 Cal.3d at 890, the California Supreme Court upheld the constitutionality of article I, section 28(d) abolishing the use of independent state grounds for the exclusion of evidence for search and seizure violations and relying upon such judge-made remedies solely to the extent they are available under federal law. <u>See also</u> *People v. May* (1988) 44 Cal.3d 309, 318. Therefore, under settled California law, any exclusionary rule asserted under article I, section 13 would operate to the extent available under the Fourth Amendment.

Any other possible reliance on article I, section 13 in challenging school metal detectors would have to overcome two significant hurdles. <u>First</u>, since the use of school metal detectors

---

50. By analogy, other cases involving metal detector searches have noted a possible conflict between the Fourth Amendment and other constitutional provisions, including the First Amendment, the right to interstate travel, and the right to attend public trials. <u>See, e.g.</u>, *Wilkinson*, 832 F.2d at 1339 (citing cases); <u>see also</u> *$124,570 U.S. Currency*, 873 F.2d at 1248 n.8 (noting "some compelling state interest must exist before the government can burden the constitutional right to travel"); *Davis*, 482 F.2d at 912-13 & n.57 (noting requirement of "a compelling state interest"); <u>accord</u> *Albarado*, 495 F.2d at 807 n.15 (noting "conditioning air travel on a waiver of fourth amendment rights . . . if it serves a compelling governmental interest may be justified, thereby making the search reasonable").

51. Article I, section 13 provides:

        The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated; and a warrant may not issue except on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons and things to be seized.

has already been shown to satisfy even a compelling interest balancing test for the right to privacy, it is difficult to conceive of any balancing test under article I, section 13 which a school metal detector program could not satisfy, given the fundamental and substantial state interests at stake weighed against the minimal intrusion, as previously discussed. Second, in order to give effect to each constitutional provision, any analysis under article I, section 13 should take into account the objectives of the independent, inalienable right to safe schools, safeguarded under article I, subsection 28(c). See Discussion in Subsection III(E)(1)(c), supra. For these reasons, article I, section 13 would not pose a barrier to the reasonable application of metal detectors to students.

## IV. CONCLUSION

Regrettably, weapons have proliferated in our schools. The incidence of weapons in primary and secondary schools in California has risen to unacceptable levels, often threatening the security of schools and the primary mission of schools to teach and train our students. In many schools, school administrators and teachers are wrestling with appropriate responses to deter weapons and promote a positive learning environment.

We conclude that the reasonable application of metal detectors in schools, as a matter of law, does not violate the Fourth Amendment or California constitutional and statutory standards. Thus, the use of metal detectors may represent a viable tool for school officials to deter weapons on school grounds. As Justice Mosk observed only seven years ago:

> We live in troublesome, indeed hazardous times. A decade or two ago the potential delinquent pupil was merely truant, smoked cigarettes, and drove hot rod cars. Today, the delinquent of the same age is often violent, and some use drugs and deadly weapons. If we are not to have countless future generations of adult criminals, we must make as certain as possible that we do not permit criminality to begin with juveniles in public schools. We do not have police officers in our classrooms. Therefore we must give to teachers and principals all the tools they reasonably need to preserve order in classrooms and school grounds.

*William G*, 40 Cal.3d at 574 (Mosk, J., dissenting); cf. *Schaill*, 864 F.2d at 1324 ("If the schools are to prosper, school administrators must have reasonable means at their disposal to deter conduct which substantially disrupts the school environment.").

Local school officials are the appropriate authorities to determine, as a matter of policy, "if," "when," "where," and "how" metal detectors should be used to deter the presence of weapons given the unique circumstances in their school. Therefore, where a substantial safety problem exists, schools, at their discretion, may decide that metal detectors should be employed as part of a plan to keep weapons out. If a decision is made to use metal detectors in one form or another, school policy makers should establish an administrative plan to guide school officials in implementing the plan.

As discussed above, at issue is not only the privacy concerns of individual students who might question the particular use of metal detectors in schools but also the safety concerns of other students and school personnel who may in fact welcome steps to mitigate the threat and fear of weapons on school grounds, including the minimal intrusion resulting from a metal detector scan. Moreover, for many schools there may be no less restrictive alternatives available to deter otherwise concealable weapons. Students and teachers are entitled to attend safe schools free of weapons. Importantly, the legitimate privacy interests of students can be protected and respected by reasonable procedures in order to pursue the compelling interest to furnish a safe learning environment free of weapons.

****